THE STATE OF IOWA, Appellee, v. MYRON E. BILLINGS, Appellant.

1. **Murder**: CIRCUMSTANTIAL EVIDENCE: NEW TRIAL. The deceased, with whose murder the defendant was charged, was found in his office fatally wounded from a pistol shot, the wound and burned condition of the nose and eyelashes indicating that the pistol when discharged must have been placed with the muzzle against the face and under the eyebrow, and the situation of the revolver being such as it might naturally have been if discharged by the deceased himself. But two shots were fired, being about four and one-half seconds apart, both of which were from the revolver found by the side of the deceased; and but two balls were ever discovered, one in the head of the deceased, and the other in the back of defendant. The deceased was a man of good physique, in the vigor of his physical manhood, and capable of preventing a deadly assault with a revolver placed against his face. *Held*, that the undisputed facts in the case being inconsistent with murder, but consistent with suicide, the burden was upon the state to overcome the presumptions arising from such facts with affirmative proof of the guilt of the defendant, and that, the state having failed to do this, a verdict of murder in the second degree was erroneous.

2. ———— : ———— : ————. The trial judge in announcing his reasons for overruling the motion for a new trial stated, that if he were the jury trying this case he should render a verdict of not guilty ; that it was possible that the defendant shot the deceased, but not probable ; and that he thought, if there were no appeal, he should set the verdict aside. The remarks of the judge were, at his direction, taken down by the reporter, and were made a part of the record. *Held*, that the record sufficiently indicated that in the opinion of the district court the verdict was not supported by the evidence, and it was its duty, therefore, upon that ground, to have granted the defendant a new trial as provided by law ; and that, having failed to do so, its judgment should for such reason be reversed, independent of the views of the supreme court of the sufficiency of the evidence to sustain the verdict.

*Appeal from Black Hawk District Court.*—HON. JOHN J. NEY, Judge.

TUESDAY, OCTOBER 14, 1890.

THE defendant was indicted for the murder of Willis S. Kingsley on the twenty-first day of December, 1887, in Bremer county. The indictment was tried in Bremer county in 1888, and a verdict was returned of murder of the second degree, and from the judgment thereon, of life imprisonment, the defendant appealed, and the judgment was reversed, and a new trial ordered. The venue of the case was changed to Black Hawk county, where the case was again tried, with a like verdict and judgment, and the defendant again appeals.

*W. L. Eaton* and *C. Wellington*, with *M. E. Billings, pro se,* for appellant.

*John Y. Stone,* Attorney General, *C. W. Mullan,* County Attorney, and *E. A. Dawson,* for the State.

GRANGER, J.—I. Willis S. Kingsley was, on the twenty-first of December, 1887, an attorney at law, and

1. MURDER: circumstantial evidence: new trial. county attorney for Bremer county. His office was in the city of Waverly, on the north side of Bremer avenue. It consisted of two rooms, being a front and rear room, connected

by folding doors.    These rooms were on a second floor, with a door leading from each to a hall and stairway. On the same floor, in the rear of the office, were two rooms occupied by Dr. C. P. Byers.    About six o'clock on the evening of December 21, 1887, Kingsley was found in a dying condition on the floor of his office, lying just inside the rear room, with his head against one of the folding doors, partly opened, and in such manner that his head was pressed forward till his chin was rested on his breast.    When found he was alive, but unconscious, and died in a few moments, and without regaining consciousness.    Soon after being discovered, the body was so moved lengthwise as to avoid the cramped position, and allow the head to rest on a cushion on the floor. The right arm lay along the right side on the floor, somewhat bent, so that the hand was near the hip, the fingers being also slightly bent.    Between the hand and the hip, with the barrel somewhat under the hip or thigh, lay a revolver, from which two shots had been fired, one of which caused the death of Kingsley.    The ball had entered the head of Kingsley near the junction of the right nasal and frontal bones, at a point spoken of as the "inner angle of the right eye."    On a chair in the front room of the office lay the overcoat of the defendant, in one pocket of which was an unloaded revolver, which had not been discharged on that occasion.    But two shots had been fired, and both from the revolver lying by the side of Kingsley, and there were about four and one-half seconds of time between the two shots.    Immediately after the shots were fired, the defendant came from the stairway leading to Kingsley's office, with the remark:  "I'm shot, and I have the papers to show why.    I am shot.    Kingsley has shot me, and I want some one to help me."    An examination disclosed a hole through the back of the coat, vest, shirt and undershirt of the defendant, and that the ring connecting the lower and upper parts of the suspenders was broken, the suspenders separated, and a revolver ball, somewhat flattened, was impressed upon and adhered to the suspender ring.    Directly over the

spinous process, and about on a line with the lower ends of the shoulder blades, was a slight wound about the "size of a three-cent piece," and slightly swollen.

It may here be stated that the testimony as to the killing is entirely circumstantial. No living person, barring the defendant, has positive knowledge of the facts. For some time just prior to the killing the defendant was in the office of Kingsley, and Dr. C. P. Byers, who was in the adjoining office, heard loud words, and, stepping to his door, overheard some parts of an altercation, and his is the only testimony of a third person of what occurred at that time between defendant and Kingsley. The following is a part of his testimony: "The first words I heard of the conversation was an order to 'Get out of my office.' That order was made by Kingsley. These are the words I heard: 'I want you to get out of my office.' Don't think I heard any reply to that order. I went to the door and opened it partially, and stood there. Then I heard that order repeated. Heard it repeated a good many times. Heard Billings reply in answer like this: 'That he wasn't going out.' I think he said: 'I am not going out.' Then I heard a movement in Kingsley's office. Think Billings said he came to have a talk. Think Kingsley repeated the order to 'Go out,' but Billings said he would not go out; that he had come to have a talk. Heard Kingsley say next: 'You darned old stinker, you have been trying to work up a scheme on me, and I want you to get out.' Don't think I heard any reply to that. I think Kingsley repeated that order. I think after that the door opened suddenly, and closed with a bang. Think it was Kingsley's door to front office. I then heard Billings open the conversation with something about his wife. That was all I understood of that. Then he said something about some 'beastly act.' In reply to that I think Kingsley said: 'Do you mean to accuse me of that, or say that I did that?' And Billings said: 'I said nothing of that kind.' I understood no more of the conversation. I heard the sound of voices going on in a conversation,

but couldn't understand it. That continued quite a
while. I heard Billings say that, 'When I returned,
it was with the intention of blowing your brains out,
but something prevented me, or changed my mind.'
Did not hear Kingsley make any reply to this. Do not
remember hearing any further conversation that I could
understand. This conversation went on quite a while
after that. After that I heard two sharp reports. They
sounded like pistol shots. Thin. I stood at my door
with it partially opened when I heard the first shot.
Think my door was open more than a foot. I could see
straight ahead, out of my door into the hall. The door
latched on the north side, and swung in the room to the
south. Think I was standing at the door, with my
hand on the knob, with the door open about a foot,
when I heard the first pistol shot. It sounded in the
front part of the building. I can't recollect whether I
heard the door of Kingsley's office open at any time
after the time I heard it open and close with a bang.
I did not see any flash or light of a pistol shot in the
hall. I heard another pistol shot following that one.
Think I heard the second shot about four seconds after
the first shot." The witness now here claps his hands
together four times. The reporter times witness while
he claps his hands four times. By the reporter: "I
got it four and one-half seconds." It is stipulated by
the attorneys for the defendant, and also for the state,
that the reporter found the time to be four and a half
seconds. Witness: "Think I was standing in the
same place at the time I heard the second pistol shot
as I was when I heard the first shot. I was standing
inside of the door, looking into the hall. I don't
remember of hearing any door in Kingsley's or in that
building open and close between the time of the first
pistol shot and the second pistol shot. At the time
that I heard the second pistol shot I did not see any
flash or light of a pistol shot either in the hall or upon
the stairway. I have no recollection now of hearing
anyone come out of Kingsley's office and step up on
the hall or go down the stairs before the time that I

heard the second pistol shot. Following the second pistol shot, I heard the falling of a body. It sounded as though a very heavy body fell upon the floor. This occurred immediately after I heard the second pistol shot."

The defendant had contemplated, or at least prepared, some papers, looking to a criminal prosecution of Kingsley for the seduction of one Emily Shane, and he either believed, or professed to believe, that there had been criminal intimacy between his wife and Kingsley; and defendant's mission to the office of Kingsley on the night in question was with reference to one or both of these matters.

On the person of defendant, when he came from the office of Kingsley, was an envelope containing papers, which we need only briefly describe. Exhibit 13 is in the handwriting of the defendant, and is as follows:

"WAVERLY, IOWA, 1887.

"*M. E. Billings, Attorney:*

"I herewith deliver to you my notes as follows: Three hundred and sixty dollars due in equal monthly installments in 1888; two hundred and forty dollars due in equal monthly installments in 1889. Fourteen notes, for twenty dollars each, due in equal monthly installments or one each year from 1890 to 1903, inclusive. Also a chattel and real-estate mortgage to secure the same. Also an assignment of same amounts per month, as in notes of my salary as county attorney, to further secure the same. Said notes being for damages occasioned by my seducing and debauching the lady who was of irreproachable character."

This paper was without signature, and there were also notes, a real-estate and a chattel mortgage, unsigned, with dates for payments, and amounts to correspond with the assignment (Exhibit 13); also an information charging Kingsley with the crime of adultery with defendant's wife, with the name of Delia E. Billings as informant, and sworn to before M. E. Billings as notary public. This was in the handwriting of defendant, and

the name of his wife affixed thereto without authority; also an information charging Kingsley with the crime of seduction, with Emily Shane as informant, and sworn to before M. E. Billings; the information, except signature, being in his handwriting. On the back thereof was the indorsement: "A. T. Brown, for the prosecution." On the person of the defendant were also the following papers: A purported letter of confession, with Mrs. Billings' name thereto, and addressed to "Wronged and ruined husband." The letter is a confession of criminal intimacy with Kingsley, and contains an elaborate statement of facts and circumstances, disgusting, and, if true, deplorable. It is in part a statement of what defendant says was a verbal confession of his wife to him, and a part, he says, was to serve as a decoy for Kingsley, and is not claimed to be true, and was written by the defendant without the knowledge of his wife. Also a paper purporting to be an affidavit on affirmation, by M. E. Billings before D. T. Gibson, a notary public, detailing facts of his observation, showing, if true, almost conclusively, a criminal intimacy between his wife and Kingsley; also his wife's statements to him of her criminal conduct, and other matters. To this affidavit the signature of the affiant was placed by defendant without authority; also the body of an affidavit purporting to be that of a "friend" of defendant without signature or the name of the affiant appearing elsewhere. It was written by defendant, and an unsigned jurat fixes the date "twenty-first day of December, 1887." Its recitals are, that the "friend" personally witnessed criminal intimacy between defendant's wife and Kingsley, August 6, 1887. Other papers found on the person of the defendant it is not important to notice.

A principal purpose on the part of the state by these papers, and of much other testimony, as to a claimed intimacy of Kingsley with Emily Shane and defendant's wife, was to show a motive for the commission of the crime charged, it being the theory of the prosecution that the charge of criminal intimacy is

false, and that defendant wickedly conceived a purpose to extort from Kingsley, by way of obligations, his property, both present and prospective, or take his life. On the other hand, the theory of the defense is that the charge of intimacy is true, and that Kingsley, being confronted by Billings in person with the charge, as the result of an altercation that followed, made the assault, and, as Billings was fleeing down the stairway, fired what he supposed to be a fatal shot, and, in a moment of desperation, prompted by the situation, involving his character, family, friends and future, put an end to his existence. As this theory involves motives for so desperate an act, it should be stated that, in the left hand of Kingsley when found, in his own handwriting, crumpled, tightly clenched, and blood-stained, was the following unfinished letter:

"BREMER COUNTY, IOWA.
"Office of W. S. Kingsley, County Attorney.

"WAVERLY, December 21, 1887.

"*Samuel E. Sprague, Esq., Des Moines, Iowa.*

"DEAR SPRAGUE:—You will excuse this letter at this time, but I am now in a very swearing mood, and I am going to tell you what the reason thereof is. You will remember, I think, what I told you about the trouble I was having with that old cuss of an attorney that moved out of my office the day you was here. You remember, do you, what I said about how I locked the door on him, and also that when I went to dinner that I locked the south door of my office from the inside, and went out of the north door, so that he could not get in while I was at dinner? Now, Sam, if you do, I want you to help me out by a statement to that effect. That old son of a b——h has got up a most damnable blackmail on me, and has given publicity to it, and I am getting the better of him, and it's causing quite a stir here in social and business circles. He became offended at my turning him out of my office, and has now claimed that he came to my office several times, and found the door locked, and that I was having fast

women there for unlawful purposes, and I want to show how the door came to be locked, and, if you can give me your hand on the matter, I can squelch his attempt, and that most successfully, too. The old cuss has run out here, and is going to leave the city,—utter failure indeed,—and that's what he is doing it for, as he is going to go to Cali— "

In Kingsley's pocket was found a letter in pencil, in the handwriting of defendant, dated December 21, 1887, signed " D." It is addressed to W. S. Kingsley, and speaks of the writer as an expectant mother, and of Kingsley as the father. It asks for twenty-five dollars. Says she is going to her mother, and will " get rid " of the child; that she has written a long confession which she will leave for "N." (defendant), and will kill herself if she does not get away that day. It is not claimed that Mrs. Billings knew of this letter. It is what defendant calls a "decoy," designed to obtain a confession from Kingsley. The letter contains other statements which we do not recite. In his pocket was also an affidavit of Emily Shane, dated December 15, 1887, containing an explicit denial of any improper conduct or intercourse between herself and Kingsley, and also statements that any affidavit in the possession of M. E. Billings or others, to the contrary, is false, and that her signature thereto was obtained without her knowing the contents.

There is a large amount of evidence on both sides designed and tending to influence, modify or change the natural or reasonable inference to be drawn from the possession of these papers by both defendant and Kingsley, which cannot be made to appear; and, with reference to the question of motives, we have no difficulty in concluding, in the light of investigations, both judicial and otherwise, that murders and suicides have often been induced by motives less powerful. In argument to us, orally, counsel for the state dwelt mainly on the evidence and facts showing motives, and the depravity of the defendant, as a ground for belief in his guilt, while the other side contended that

the circumstances immediately surrounding the death precluded a reasonable belief that the defendant fired the fatal shot, and also that the record shows affirmatively that such was the judgment of the district court; and it is to these contentions of appellant that we devote our attention, for the record presents no other ground on which we could reverse the judgment.

The defendant was not a witness on the last trial. At the coroner's inquest he was present, and made an elaborate statement of what transpired in Kingsley's office, and with regard to the papers found on his person; and the state, on the last trial, put his statements in evidence. We are not disposed, in our consideration of the case, where not corroborated, to attach to those statements importance, except as against the defendant, for several reasons, and among them, *first*, that his admissions in the case, and the undisputed facts, so involved his character for veracity as to make his statements, uncorroborated, of little worth; and, *second*, that the facts to serve as a basis for our conclusions must, in the main, be unquestioned. These facts, in brief, are that Kingsley was found in his office fatally wounded by a pistol shot; that beside him lay the revolver from which the shot was fired, and in the position that it might naturally have been if discharged by himself; that the pistol, when discharged, must have been placed with the muzzle against the face, and under the eyebrow, as evidenced by the eyelashes being burned, and the nose burned and powder-stained below the wound, and the eyebrow and face above the wound being unaffected; that he was a man of good physique, in the vigor of his physical manhood, and, if observing, capable of, and prompted by the law of self-preservation, would have prevented a deadly assault with a pistol placed against his face; that such a position for a revolver is a natural one for a person committing suicide, and unnatural for one taking the life of another, even in the absence of anticipated resistance; that but two shots were fired, and but two balls have ever been discovered—one in the head of Kingsley, and one against

the back of the defendant ; that it is inevitable that both shots were fired by the same person, and by either Kingsley or the defendant ; that immediately preceding the tragic occurrence, and connected with it, was an altercation involving charges against Kingsley, so grave and important to the parties, as from their truth or falsity, and the provocations of the moment, to serve either as a motive for the taking of human life.

With these undisputed facts, uninfluenced by others, the verdict of all men would be that the shots were fired by Kingsley. They would not sustain a verdict against the defendant, even on the basis of a probability. We must then look to the theory and claims of the prosecution to so change the force of such facts that the verdict against the defendant may have support in the evidence beyond a reasonable doubt. The prosecution says, as to the ball against defendant's back, that it was a simulated affair, adjusted by the defendant as part of his plan to obtain Kingsley's signature to the papers in his possession, or take his life. As to the shots, its theory is that the first shot was a blank cartridge,—that is, a cartridge with powder and no ball, to harmonize with the plan of adjusting the ball on the suspenders, and that, after firing the second and fatal shot, he placed the revolver beside Kingsley, and made his escape from the office to the sidewalk. If we concede that degradation on the part of the defendant, which is a necessary accompaniment of a purpose to murder for personal gain only, there still remains to his credit an adroitness and cunning both for conception and execution very difficult to believe. The adroitness is not so much in discovering the salient features of the plan as in perceiving, in advance, the situation necessary to execution. It is less difficult after execution, with the facts known, to theorize upon the designs and purposes of another, than to, in advance, plan for the execution, to obtain which certain conditions must be ; and the particular facts of this case afford a fitting illustration. We have said, and it will

not be questioned, that the proximity of the revolver to
the face when discharged, and the marks upon the face,
are indications of suicide; and the plan ascribed to the
defendant is to mark his pathway with such evidence.
It is his plan, then, to first fire the blank cartridge,
which is to be evidence to those who may hear, but
cannot see, that Kingsley fired the ball against his back,
and then to place his revolver so close to Kingsley's
face or person that the discharge will be evidence of
suicide. Who would believe, in advance, that such a
plan could be executed? The first shot would serve to
put Kingsley on his guard, and, with four and one-half
seconds between the shots, the chances are greater that
the second shot would not have been fired by defendant,
than that the revolver would have been put against
Kingsley's face in a deadly assault. Of course, we
should not treat the case as if no part of the execution
could have been the result of momentary impulse, or
as prompted by the situation as then seen, and we
design to attach particular importance only to those
matters which must have been anticipated, if the theory
of the prosecution is true; and, if it be said that the
particular time between shots might not have been
calculated in advance, it still remains that to cock such
a revolver by raising the hammer with the thumb, and
make such an assault, would, of necessity, consume
about that time; and if the theory is divested of any
consideration as to time, and what might naturally
occur to defeat the purpose, it must fall of its own
weight. It fails to recommend itself for candid consid-
eration. The only aid claimed for this theory in the
testimony is the enmity of defendant towards Kingsley,
his diabolical scheme to extort money from him, as
evidenced by the papers in defendant's possession at
the time, and his threats to take the life of Kingsley.
But these considerations do not reach the question of
the impracticability of the theory by which the prose-
cution seeks to avoid facts which, unavoided, practi-
cally acquit defendant of the crime.

The case, in this connection, is quite peculiar in this, that the state must, in the course of its prosecution, concede or establish a state of facts inconsistent with murder, but consistent with suicide ; such facts being entirely independent of the question of motive, and pointing directly to the act of killing.    It must then assume the burden of such a showing as will avoid the presumptions arising from such facts, and show the guilt of the defendant.    In this respect the state is confronted with an unusual and exceeding difficulty, because each has a motive for taking the life of the other, and the facts, barring those of a speculative character, show that the defendant was assaulted, and that Kingsley fell by his own hand.    It is true that defendant threatened to take the life of Kingsley ; but it is equally true that Kingsley had threatened to take the life of defendant.    Their hatred was mutual, and Kingsley's provocation, if the accusations against him were false, was much the greater.    Barring the facts that the defendant's depravity conclusively appears, and that of Kingsley does not, we think the case is without a reasonable doubt that Kingsley fired the fatal shot.    While such depravity as shown by the record is a proper element to be consided in determining the guilt of the defendant, it is not shown to be of a murderous character, and certainly cannot override the affirmative facts that point to his innocence of the crime charged.    For other offenses he is not on trial.

The theory of simulation for the wound on defendant's back, and the ball on the suspenders, standing alone, is not conclusively contradicted by reason and the probabilities of the case, but it is to a great extent; and associated, as it must be, with the entire transaction, it really has nothing for its support.    It is especially urged in this connection that the holes through the clothing are out of the necessary positions to support defendant's claim that the ball was fired against him.    Defendant and the clothing were before us at the trial, the clothes placed on him, and some of the members of the court placed him in the position he claims

to have been in when wounded; and, considering the direction from which the ball would come, the experiment, in illustration of the evidence, to a great extent avoids the force of the objection.

There are many items of evidence, both for and against the theory of the state, that we cannot in an opinion notice, nor is it important that we should. Much attention has been given to the time between the last shot and the time defendant was on the walk below, and it is urged that it was too short for defendant to have adjusted the revolver and made the distance. If this was the only ground upon which the claim for a new trial was based, we should refuse it, because we think the accomplishment possible in point of time under the evidence, when we know the distance made by other parties between the report of the pistol and appearance of defendant on the walk. We should not overlook a fact of much significance to us, and that is the testimony of Dr. Byers. He heard but parts of the altercation in the office of Kingsley, but such parts as he did hear were, to some extent, corroborative of the statements of defendant before the coroner as to what occurred. He fixes both doors leading from Kingsley's office to the hall as shut, but he says he heard both shots, and that the first report was the louder. There is no fact to show why the first was the louder, if both doors were shut when both shots were fired. If, on the contrary, one shot was fired at the head of the stairs in the hall, it would have been louder to him than would have been the second, which was surely fired in the office, for he was standing at his open door, looking into the hall, and from the stairway to him the way was direct and open, while from the office the way was indirect, and the sound would have been obstructed by partition walls. It is true that Mr. Byers afterwards said when recalled and his attention directed to the fact of the first shot being louder: "I will just change that a little because the door must have been open." But in that case no different inference would follow, because

then the door was open when both shots were fired, for it would not be claimed that, in the four and one-half seconds between the shots, the condition of the doors was changed. If the door was open when both shots were fired, there is still no reason for the first being louder, unless it was fired in the hall.

The problem to demonstrate the truth as to Willis S. Kingsley's death will probably never be solved. He was, for a time, an associate with, and a boarder at the home of, the defendant. The future may yet reveal the truth as to his guilt or innocence of the crime imputed to him, of invading the sanctity of the defendant's home. Upon the face of the record we should exculpate him. The loathsome record made for themselves by his accusers excludes belief in their statements wherever not corroborated; but this does not convict the defendant of a crime which the state must establish by proof. And here we incline to think is to some extent a secret of the adjudications of this case. Kingsley is dead; the defendant was believed to be a bad man, and such facts were allowed to prevail where affirmative proof of facts were required.

II. We are to consider another question of great, if not controlling, importance in the case, and incidentally to the same point. The district court, in passing upon the motion for a new trial, gave quite extended reasons for its rulings, and ordered them to be made a part of the record for our consideration. We do not set out the comments of the court entire, but will in part. The court commenced by a statement: "If I were the jury trying this case, I should render a verdict of not guilty from the evidence introduced here." It comments on the condition of Kingsley's face; the position in which the revolver must have been placed; the position of the revolver beside Kingsley; the ball and wound on the back of defendant, and the holes in the clothing; and concludes that they "point rather to an assault on Kingsley's part, and subsequent suicide, than they do to Billings' murder of Kingsley."

The court then comments on the charge against Kingsley by defendant, and the course of the defendant in regard to it in preparing the papers, and speaking of the letter of confession it says: "Billings pretends to have discovered an intimacy between Kingsley and his [Billings] wife. He does not act the part of an injured husband. He does not appear indignant and furious; but, like a slimy viper, gets up a story—a confession—that shows a mind given over to evil intentions. That confession came from nobody but a man of vile and bad mind." Again the court said: "If that confession was out of the case,—if Billings did not appear in the light he does, by reason of that confession, * * * I would have set aside the verdict as quick as it was rendered." The court afterwards states its conclusions as follows: "It is possible, and barely possible, that he might have shot Kingsley. It is within the possibilities. It is not probable. I don't think it is probable. I think these are improbable facts. I think it is improbable that the holes in the clothing were simulated. I think it is improbable he could have shot Kingsley, and hid the revolver as it was found after Kingsley's death. I think these things are very improbable. And the wound on Kingsley's head indicates the position of the revolver which seems quite improbable to my mind. But the jury has found a verdict upon these facts. I don't feel at liberty to set it aside. * * * But I am willing to have my sentiments and my views of this testimony go on record, and appear in the supreme court on his hearing, that he may have the benefit of it, and that the supreme court may view the testimony presented to them there in the light of my opinion of it here. If they see fit to set aside the verdict, all right. I think, perhaps, if there was no appeal that I should set it aside. * * * The vileness of this confession * * * stands in the way of my interfering with the verdict here."

Appellant urges that the record shows the judgment of the district court to be, that the verdict is not sustained by the evidence. Counsel for the state, on

the contrary, urge that we take notice of nothing but the order overruling the motion for a new trial. It is certainly a new and novel question in this state, and we are cited to no precedent as a guide. It is not a matter of impeaching a record by extrinsic evidence, for no question is made of the correctness of the record, and the court would surely have the right to make of record facts occurring on the trial that would tend to show the validity of the judgment. The law makes it the duty of the district court to grant a new trial in criminal cases whenever the verdict is not sustained by the evidence. Code, sec. 4489. It means, of course, whenever, in its judgment, such is the fact, for otherwise the statute would be of no avail. And, in criminal cases, whenever, in the judgment of the district court, a new trial should be granted, and in obedience thereto the order is made, it is conclusive in the case, and this court cannot disturb the order. If the state appeals, and this court concludes that the district court erred, it may so state, but it cannot reverse the judgment. Code, sec. 4539; *State v. Kinney*, 44 Iowa, 444. Hence, the legislative intent, as to the power of the district court in criminal cases, is that the court may reverse its judgment for errors against the defendant, but not in his favor. The mistake should not be made of attributing the reason of the rule in cases like this to constitional guaranties, because we are not dealing with a case in which there is an acquittal, or in which to again place the defendant on trial would be in violation of his constitutional rights.

Having then in view the authority the legislature designed the district court should exercise, we may inquire as to the effect of the record in this case. Barring the final entry by which the motion for a new trial is overruled, and the judgment of the district court—by which we now mean its convictions—is not open to question. It is not questioned to us in argument. There is not a single conclusion in the opinion of the district court favorable to the verdict. It allows it to rest only on a bare possibility. To a valid judgment the law

requires, *first*, that there shall be a verdict upon evidence to satisfy the minds of the jury beyond a reasonable doubt; and, *second*, that the judge who presides at the trial shall believe that the evidence is sufficient to justify the finding. An affirmative showing of a want of either surely avoids a judgment; and, if we may consider the entire record before us to know such facts, the result is not in doubt. It is quite difficult to read the record and avoid the belief that the district court thought, considering the magnitude of the case, the great expense of new trials, and the probable conclusiveness of the opinion of this court upon the sufficiency of the evidence, that it would be better to make an order from which an appeal could lie for the purposes of the case, than to enter a judgment, which, even if erroneous, could not be reversed, and thus compel the parties to accept its judgment. The motives, if such they were, from other points of view, may have much to commend them, and will doubtless hasten the final result of the case. They are, however, without support in the law.

That the district court was thus influenced is evidenced by many expressions in its opinion, but especially when it says, speaking of the verdict: "I think, perhaps, if there was no appeal, I should set it aside." From the record as made, we are led decidedly to the conviction that it was the judgment of the district court, as a result of its consideration, that the evidence was not sufficient to sustain the verdict. With this fact apparent of record, is there anything in the law to prevent our overruling a judgment based thereon, and in conflict with it? If so, it is the shadow, and not the substance that is of controlling force, and such a conclusion must be sustained at a sacrifice of the very essence of judicial inquiry,—the truth. It is a reasonable rule, and one having general support in adjudications, that the effect of a record is to be determined from its consideration as a whole, and that dependent portions thereof must yield a conformity to those on which they depend. If a jury should return a verdict

that "from the evidence we believe the defendant not guilty, but we return a verdict of guilty," a judgment of conviction would not lie, because not in conformity with the actual findings, but a judgment of acquittal would, because based on the belief of the jury from the evidence. The illustration may not, in every sense, be a parallel, but it is kindred in its nature, and shows that courts do not allow actual facts to become subservient to mere forms, and that the convictions of the mind, when properly known, will override a work of the hand that merely notes an unsupported conclusion. We regard such a rule as applicable to the facts under consideration, and conclusive of the case, independent of our views as to the sufficiency of the testimony to sustain the verdict.

On the former trial in this court, we did not discuss the value of the evidence, as other errors necessitated a reversal, and the arguments then were entirely, as they now are, mainly, oral; and between the submission and the determination of the case, the *personnel* of the court to some extent changed. Besides, if the case was to be reversed on other grounds, it seemed advisable to not embarrass another trial with our view of the facts and the evidence, as in the event of a change in the testimony, which often occurs on a second trial, our comments might be given undue weight. As after a second trial we may reasonably conclude that the facts on which the state relies for a conviction are fully presented, and that the state may properly determine the propriety of further prosecution, we have announced our views as to the sufficiency of the evidence to sustain a conviction. Our conclusion in this respect is in harmony with that of the judge who presided at the trial, and gave to the testimony long and patient attention, with many added opportunities to know its value, and because of this we are less reluctant to interfere with the verdict, because of a want of evidence, than we otherwise would be under a well-known rule as to caution in such cases.

These considerations make our duty plain, and the judgment of the district court is again REVERSED.