STATE OF IOWA, Appellee, v. ARTHUR HICKMAN, Appellee, et al., Appellant.

GRAND JURY: Qualifications—Waiver. An accused who is held to
1   answer to the grand jury is absolutely bound by his waiver of all challenge to the grand jury or to the individual members thereof.

GRAND JURY: Qualifications—Women. A woman, being a qualified
2   elector, is qualified for grand jury service.

HOMICIDE: Indictment—Issues, Proof, and Variance. The actual
3   perpetrator of a murder and an accessory before the fact may be joined in the same indictment, without any allegation of concert of action or conspiracy.

CRIMINAL LAW: Other Offenses—Series of Acts. On a charge of
4   murder, a series of acts preceding the actual homicide may be so connected with the homicide as to be admissible, even though such prior acts in themselves reveal the commission of a separate crime; and such prior acts may also be admissible on the issue of identification of the accused.

HOMICIDE: Excusable or Justifiable—Officer Making Arrest. Evi-
5   dence relative to the efforts of an officer to make an arrest reviewed, and held to present no issue as to self-defense.

HOMICIDE: Evidence—Cause of Death. The cause of death may suf-
6   ficiently appear from the nature and location of the wounds upon the body and from the evidence as to how said wounds were inflicted.

CRIMINAL LAW: Admissions—Failure to Warn. Extrajudicial admis-
7 sions by an accused may be admissible against him, even though
the accused be not warned as to the effect thereof.

CRIMINAL LAW: Arguments—Permissible Scope. Principle reaf-
8 firmed that the privilege of the State's attorney to ''drown the
stage in tears, make mad the guilty and appall the free'' does
not necessarily give to the convicted accused the right to a new
trial.

*Appeal from Cass District Court.*—GEORGE W. CULLISON, Judge.

APRIL 3, 1923.

THE defendants were jointly indicted by the grand jury
of Page County for the crime of murder in the first degree. A
change of venue was taken to Cass County. They were tried
to a jury and found guilty, and life sentences imposed. This
appeal has to do with defendant Benjamin.—*Affirmed.*

*John J. Hess, Earl R. Ferguson,* and *C. B. Clovis,* for ap-
pellant.

*Ben J. Gibson,* Attorney-general, *John J. Fletcher,* Assist-
ant Attorney-general, *W. E. Mitchell, George A. Anderson,* and
*L. H. Mattox,* for appellee.

PRESTON, C. J.—We think it advisable at the start to set
out the evidence in a general way, so that the fifty points made
may be better understood.

The crime charged in the indictment was committed late
in the afternoon or in the early evening of February 12, 1921,
in Page County, at a little town named Bingham, six or seven
miles southeast of Shenandoah, on the railroad. An hour or
two before the shooting, there was a crap game at the railway
Y, near the depot in Shenandoah, in which a number of men
participated. While the crap game was going on, the defend-
ants came, and, at the point of revolvers, forced the crowd of
men who were participating in the game to line up, with their
heels to the rail, and took from the persons of different ones
considerable sums of money. The defendants told the other
parties that they were not going to take any chances, and that

they would drop the first fellow that moved. Thereafter, defendants were seen on the way to Bingham. A short time after the robbery, some of those who were present informed the city marshal of the occurrence; and about half an hour thereafter, the deceased, Albert Patton, who was a deputy sheriff, was also informed of the transaction, and requested his informant to go with him, to identify the men who had perpetrated the hold-up. Patton telephoned to Bingham, to have men there arrest the parties and hold them until he should come. Patton and two or three others took the 6:54 train at Shenandoah, arriving at Bingham a few minutes after 7 o'clock. As the train approached the depot in Bingham, defendants were seen running ahead of the train, along the west side of the track, towards some tie piles, a short distance northwest of the depot. About the time the train passed the tie piles, or soon after, and before the train stopped, the city marshal said to Patton, "Here they are, Bert," and Patton came across from the east side of the train and jumped off on the southeast side of the station and right-hand side of the train. The marshal says further:

"After Bert got off, I got off on the same side. Before I got off, I heard shots fired. Just as I jumped off the train, saw the flash from the northwest. It came from the farthest tie pile to the north. The direction of the flash was kind of southeast from the north pile of ties. Patton was in a southeasterly direction from the tie pile, facing it,—no one between him and it. I started to get back on the train. Heard shots after that, when I was in the car,—five or six. Only saw the flash of the first shot."

Another witness who was present says that he heard just one shot fired before he got back on the train; that he was excited, and got back on the train as soon as he could; and that he heard several shots fired.

As Patton, and perhaps some of the others, stepped off the train, Patton started back towards the tie piles, and called to the defendants to halt and surrender. Thereupon, immediately, the defendants shot in the direction of Patton, who was then, according to the testimony of some of the witnesses, 15 or 20 feet from the tie pile farthest to the north. Other witnesses put it at a somewhat greater distance. He fell, and was carried to the depot. He died before the depot was reached. A number

of shots were fired in a short space of time. There is evidence tending to show that the defendants admitted that they fired five shots: one of them three, and the other two. The other parties with Patton fired several shots. Patton himself fired two: one of them towards the tie pile, and the second one in the air. All the witnesses for the State say that no shots were fired by Patton or those with him until after defendants began shooting. The defendants did not testify as witnesses. Testimony was introduced in their behalf, of witnesses who were inside the car, who say that they heard shots on the outside of the car, and that it seemed to them that the first shots were near the train. These witnesses do not all agree as to just where the shots seemed to be. The record shows, we think, that the first shots were fired at about the time or very soon after the train had passed the tie piles, and that the tie piles were but a short distance from the train. It is said by appellant that there is a conflict in the testimony as to whether the shooting was first commenced by the defendants behind the tie pile or by those who had stepped off the train. No such inference can be drawn from the evidence. It is from this claim that counsel for defendants seek to build up a case of self-defense. They predicate error upon the refusal of the trial court to instruct the jury on that proposition. The contention is that defendants did not know that Patton was an officer, or that he was attempting to make an arrest; that they supposed, and had a right to suppose, that they were being attacked by others; and that they defended themselves from such attack. There is no word of evidence from any witness who claims to know whether Patton and those with him fired the shots, if they did commence firing first, in the air, to frighten defendants into a surrender, or whether such shots, if so fired, were in the direction of the defendants. There is no evidence from the defendants or any other person that Patton or those with him were shooting at the defendants, or that defendants were in danger of bodily harm, or that, as reasonable men, under the circumstances, they anticipated harm. In other words, there is no evidence that these and other necessary elements were present which would justify a claim of self-defense by the defendants. We have examined the evidence

carefully on this point, because appellant argues this proposition more strongly than some others.

This is a skeleton outline of the case. We have given the tendency of the evidence. Though there may be, at some points, some disagreement as to some of the circumstances, the jury could have found as we have indicated.

Some other circumstances will be referred to briefly, tending to establish the guilt of the defendants, their own consciousness of guilt, their anticipation of arrest, and other matters. Some of these circumstances, particularly as to alleged conversations with defendants in the jail and on the train afterwards, are denied by other witnesses, introduced by the defendants, who were present.

At the time of the transaction, it was getting dark. There were switch lights and other lights in the neighborhood. The marshal and perhaps some others fired towards the tie pile after Patton fell. The defendants were arrested in Missouri, about the 14th of February, 1921, and were brought back to Iowa three or four days later, and were taken to Council Bluffs. Three or four witnesses testify that, on the train at this time, they heard a deputy sheriff ask defendants if they knew they had killed Patton. They made no answer. The deputy said, "Did you know that you hit him?" and one of the defendants said, "We was so close to him I don't see how we could miss him." The defendants were sitting together. Defendant Benjamin at that time said he had a big white hat on, the night Patton was killed, and that he hid the hat in the culvert; that he had another hat in his pocket; that he changed his hat; that the white one was a western cowboy hat, and would attract attention. In this conversation, defendants said that, after the shooting, they went back to the track or road that runs along the track; got into a field; took a southeasterly direction to a barn; crawled through a gate at the fair ground; and took breakfast in Missouri, the morning after the shooting. They also said that they stayed in a barn Sunday night; that, if anyone had stopped them, they would have said they were hunting the Hickman boys. In the conversation in the Missouri jail, Benjamin said, "Who are you?" and witness said, "I am the sheriff of Page County." Defendant said, "The hell,—I

thought I killed you at Bingham;'' and witness said, ''No, you killed my deputy;'' and defendant said, ''It's too bad it was not you.'' Later, the deputy sheriff asked defendant Arthur Hickman, ''Did you know that you had hit Bert?'' and he said: ''Yes, I couldn't have missed him; he was not over ten feet from us.'' When he said that, Benjamin was sitting right behind him, and said nothing.

It may be necessary to state further details of the evidence, in the discussion of the different points. The verdict has ample support in the testimony.

1. The appellant raised the question, by motion to quash the indictment, and by motion for directed verdict at the close of the State's testimony, as to the right of a woman to act as a grand juror. It appears that the grand jury panel of twelve, from which the grand jury which returned this indictment was drawn, was composed of eleven men and one woman. It is appellant's contention that a woman is not a competent grand juror. It is not claimed that the woman served as a member of the grand jury which returned the indictment. The record shows that, before the indictment, and before the grand jury was sworn, two cases were docketed against the defendants: that is, at that time, the charge was against them separately. In each case, the defendants were given an opportunity to challenge the jurors and the panel, and the record shows that they waived all challenge to the grand jury and the individual members thereof. From the fact that these cases were docketed, we take it that defendants had been held to answer. It will be so presumed, where it does not appear whether they were held to answer. *State v. Gibbs,* 39 Iowa 318. It was too late to raise the question by motion for a directed verdict, because that was after pleading to the indictment. *State v. Belvel,* 89 Iowa 405, 414. It is provided by statute that a defendant held to answer may, before the grand jury is sworn, challenge the panel only for the reason that it was not selected, drawn, or summoned as prescribed by law. Code Section 5241. Section 5321, Code, 1897, provides that the ground of the motion to set aside the indictment because the grand jury was not selected, drawn, summoned, impaneled, or sworn as prescribed by law, is not allowed

1. GRAND JURY: qualifications: waiver.

to a defendant who has been held to answer before indictment. The objection in such case should be made before the grand jury is sworn.   *State v. Gibbs,* supra.   It is contended by the State that appellant, under the statutes and under the record, is bound by the waiver made before the grand jury was sworn, and that he may not now raise the question.   We think this is so.

Furthermore, qualified electors of the state, possessing other specified requisite qualifications, are competent jurors. We have recently held that, by the Nineteenth Amendment to

2. GRAND JURY: qualifications: women.

the Federal Constitution, women in this state were made qualified electors, and therefore competent jurors.   *State v. Walker,* 192 Iowa 823. This applies to grand jurors as well as to trial jurors.   We think that the *Walker* case is decisive of the proposition advanced.

2.   Appellant states his second proposition as follows: There was a misjoinder of parties, in that the two defendants were jointly charged with the commission of a crime that could

3. HOMICIDE: indictment: issues, proof, and variance.

be committed only by one.   Only one bullet took the life of the deceased, and there is no allegation of conspiracy or concert of action in the indictment, or proof thereof.   They cite Code Sections 5282 and 5289.   These sections have reference to the form of the indictment, and what it must show.   They also cite 14 Ruling Case Law 194 and 22 Cyc. 374.   But our statute, Code Section 5299, provides that:

"The distinction between an accessory before the fact and a principal is abrogated, and all persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense, or aid and abet its commission, though not present, must hereafter be indicted, tried, and punished as principals."

It has been so thoroughly settled by our own decisions that a transaction such as that charged in this case may be charged in the form of the indictment herein that a mere citation of the cases is sufficient.   *State v. Comstock,* 46 Iowa 265; *State v. Munchrath,* 78 Iowa 268, 274; *State v. Hessian,* 58 Iowa 68; *State v. Pugsley,* 75 Iowa 742; *State v. McAninch,* 172 Iowa 96; *State v. Butler,* 186 Iowa 1247; *State v. Farris,* 189 Iowa 505.

The evidence abundantly shows that both defendants were concerned in the commission of the offense charged, and that they were present, aiding and abetting each other in its commission.

3. It is thought by appellant that the court erred in permitting evidence of the transaction in the afternoon at Shenandoah, because it was a transaction separate and distinct from the charge in the indictment. It is, as contended by appellant and supported by authorities cited, the general rule that the State is not permitted, in its effort to establish the crime charged, to introduce evidence of another substantive offense. But the rule is that, where the acts are all so closely related in point of time and place, and so intimately associated with each other, that they form a continuous transaction, the whole transaction may be shown,—what immediately preceded and what immediately followed the act complained of,—for the purpose of showing the *scienter* or *quo animo* of the party charged. Every fact, every circumstance, surrounding the parties, attending their action, from the time of the meeting to the separation, is material to a proper understanding of their relationship, and has probative force in establishing their conduct towards each other. *State v. Robinson,* 170 Iowa 267, 276.

4. CRIMINAL LAW: other offenses: series of acts.

Conceding that the holdup in the afternoon was a separate offense, it was closely and directly related to the killing, a short time thereafter. The afternoon transaction was material, as throwing light upon the purpose, motives, and intention of the defendants in the later shooting. They were conscious of having committed a felony a short time before. They were trying to escape, and to prevent arrest. Their conduct and the circumstances were such as to show that they were expecting arrest. The jury could properly have found that the surrender of defendants was demanded. This evidence was not denied. That they were anticipating arrest and intended to resist, is shown by the fact that one of them changed his hat and hid the hat which he had worn during the afternoon transaction and shortly before the shooting; by their running towards the tie pile as the train approached; by their commencing to shoot, immediately after their surrender was demanded; and by other circumstances in the record. Their conduct, from their conscious-

ness of guilt, is somewhat analogous to a person's flight before
he is accused or threatened with arrest. *State v. Bige,* decided
at the present sitting; *State v. Robinson,* 170 Iowa 267, 283. It
was proper to show what was in the minds of the defendants and
of deceased when they arrived at Bingham, and at the time of
the shooting. We think, too, that the evidence was admissible
on the question of identity of the defendants. Witnesses pres-
ent at the transaction in the afternoon identified the two de-
fendants; identified their hats, their weapons, and their clothing.
They were identified by the same witnesses, shortly before the
train arrived at Bingham, as the same persons they had seen
in the afternoon, at and even before the holdup. The deceased
was a peace officer, and at the time he was shot, he was attempt-
ing to apprehend the defendants. The statute provides that a
peace officer may make an arrest without a warrant, where a
public offense has in fact been committed, and he has reasonable
ground for believing that the person to be arrested has com-
mitted it. The deceased was not present at the time of the com-
mission of the crime in the afternoon. It was proper that he
should be informed thereof, as reasonable grounds for believing
that the defendants had committed the crime and as a basis
for their arrest without a warrant. The statements by the wit-
nesses to the officers were for that purpose, and not to establish,
at the trial, the fact that a crime had been committed in the
afternoon. The facts in regard to the transaction in the after-
noon were testified to by witnesses on the stand. As supporting
our conclusion, see *State v. O'Connell,* 144 Iowa 559; *State v.
Walters,* 45 Iowa 389; *State v. Levich,* 128 Iowa 372; *State v.
Kline,* 54 Iowa 183; *State v. Schaffer,* 70 Iowa 371; *State v.
Kepper,* 65 Iowa 745; *State v. Harris,* 153 Iowa 592; *Common-
wealth v. Major,* 198 Pa. 290 (47 Atl. 741); Wharton on Homi-
cide (3d Ed.), Section 617.

4. It is unnecessary to refer to the evidence again, or more
in detail, in regard to the claim of self-defense. We think there
was no self-defense in the case. The deceased was attempting
to arrest the defendants, as he had a right to
do, and as he had indicated to them. As said,
there was no basis in the evidence for a finding
by the jury that defendants had any reason to

5. HOMICIDE:
excusable or
justifiable:
officer making
arrest.

anticipate that the officer was attempting to do anything else, or that he had attacked them, or that the appearances were such that they considered themselves in danger of an attack, or that, as a matter of necessity, defendants were compelled to shoot, to protect themselves from threatened injury. According to the State's evidence,—and the jury could have so found,—the defendants began shooting immediately upon the demand of the sheriff that they should surrender. The following cases, among others which might be cited, support our conclusion: *State v. Gainor*, 84 Iowa 209; *State v. Partipilo*, 139 Iowa 474, 478.

Some other questions relating to the exclusion of offered testimony as to the character or reputation of the deceased, as to methods of making an arrest, and perhaps some other questions, are argued, and the claim is made that they were applicable to a case of self-defense. Since we conclude that there was no self-defense in the case, it is unnecessary to discuss separately such other propositions.

5. It is next contended by appellant that there is no competent evidence of the cause of death of the deceased. *State v. Billings*, 81 Iowa 99, and *State v. Dubois*, 54 Iowa 363, are cited by appellant. In the *Billings* case it was held

6. HOMICIDE: evidence: cause of death.

that, the undisputed facts in the case being inconsistent with murder, but consistent with suicide, the conviction could not be sustained. In the *Dubois* case, the defendant was charged with larceny, and it was held that there was no evidence of the commission of the crime, except the admissions of defendant made out of court, and that a conviction could not be sustained. In the instant case, there were no marks on deceased other than what appeared to be a bullet wound in his breast, except a small scratch or sore place on one of his fingers, which is not claimed to be of any consequence. It may be necessary to refer to some additional circumstances. It appears that, immediately prior to the shooting, deceased was seen walking up the track toward the tie piles. Defendants, behind the tie piles, shot towards the deceased. A witness who saw the shooting says that, at the first shot, he saw Patton's head "kind of fly up," and he fell backward. They went to him very soon afterwards, and he died before he could be taken to the depot—practically an instant death. Upon

examination of the body and clothing, it was found that the vest and shirt were covered with blood; that there was a bullet hole in the front part of the shirt over the chest, and coming out at the back of the shirt; that the vest was covered with blood; that there was a bullet hole in the back of the overcoat. No objection was made to the evidence of the bullet holes in the clothing,—at least, no complaint is made of the admission of such evidence. The defendants stated afterwards that they thought they had killed the sheriff; were so close that they could not have missed.

A witness testifies that he went to the undertaker's, where deceased was stripped, lying on the table, and "observed a wound in the breast of the deceased [indicates]. Q. Somewhere a little to the right of the medium line of the breast bone? A. Yes, sir. Q. Could you give the jury some idea of the size of that hole or wound that you observed there? A. Well, it looked like a pretty good-sized hole.

"Mr. Hess: I move to strike that answer as incompetent and immaterial. (Overruled. Exception.)

"Q. What have you to say as to it having the appearance of having been made by a bullet wound? (Objected to as incompetent, immaterial, and irrelevant, and the witness incompetent. Overruled. Exception.) A. Well, I would say it. was a bullet wound."

The first objection, wherein defendant moved to strike the answer, was not timely. If the question was objectionable, it was as apparent when the question was asked as after the answer. · Defendant may not speculate on the answer and then, if it is unfavorable, move to strike. This being so, it was in evidence without objection that the witness saw a hole or wound in the breast. Clearly, the jury was justified in finding that the cause of death of deceased was a gunshot wound fired by the defendants, or one of them. And this is so without the last answer of the witness, that he would say it was a bullet wound. It is thought by appellant that the ruling of the trial court in permitting the last answer just referred to was error, and that the witness, a nonexpert, was permitted to give his opinion that the bullet wound was the cause of death. Such is not the case. The answer is descriptive of what the witness saw. On

this proposition, appellant cites *State v. Cross*, 68 Iowa 180; *State v. Donnelly*, 69 Iowa 705; *State v. Evans*, 122 Iowa 174; *State v. O'Callaghan*, 157 Iowa 545. The last three cases have little, if any, bearing on the proposition. In the *Cross* case, the reference to the subject is very brief. All that is said is:

"The defendant offered to show by a nonexpert how certain injuries on the defendant's person appeared to have been made. The court excluded the evidence, and we think correctly. We think that the nonexpert witness could not properly more than describe the injuries."

From this it appears that there is nothing in the opinion to indicate the nature or character of the injuries, nor was the witness asked to describe them. We have held that, in an action to recover for injuries, a witness who is not an expert may testify to the appearance of the injury a short time afterward, in order to aid the jury in determining its extent. *Weber v. City of Creston*, 75 Iowa 16. In an action for damages for assault, it is proper to admit the testimony of a witness not claimed to be an expert, as to whether the injury resulting appears recent or otherwise. *Robinson v. Halley*, 124 Iowa 443. Nonexpert witnesses may be permitted to testify as to a party's condition and appearance before an accident, with reference to his recovery from former injuries, such matters being within the range of common observation. *Winter v. Central Iowa R. Co.*, 80 Iowa 443. We said, in *Wray v. Warner*, 111 Iowa 64, that it requires no special skill or learning for a man who has been suffering from a rupture to know whether or not it has been cured, and that to say that it has or has not been cured is the statement of a fact. A fracture of the ribs may be of such unmistakable character that the person who sustained the injury may have had positive knowledge of the fact, and may testify as to it without being required to show that he is an expert. *Ferguson v. Davis County*, 57 Iowa 601. The testimony of a nonexpert witness regarding the condition of a plaintiff who is suing for personal injuries, when he came out of the hospital, is not objectionable as a conclusion, when the witness really described nothing more than what he saw. *Scott v. O'Leary*, 157 Iowa 222. The witness testifying to the bullet hole was the city marshal, and, so far as appears, he may have had experi-

ence with gunshot wounds. In any event, he did no more than to describe what he saw. Under the circumstances, we think there was no error in admitting the evidence, and that appellant suffered no prejudice by its admission.

6. It is assigned as error that the court erred in admitting evidence of admissions made by defendants while in custody, unless defendants were warned. Among the cases cited to support this proposition is *State v. Powers*, 181 Iowa 452. That was a rape case, where evidence of complaints by the prosecuting witness was elicited by questions in the nature of cross-examination, and it was held that the complaints were nonvoluntary.

7. CRIMINAL LAW: admissions: failure to warn.

*State v. Clifford*, 86 Iowa 550, does not sustain appellants' contention. Another principle of law was involved. It was there held that the involuntary admissions of one made under oath before a grand jury, with respect to an offense for which he was then under arrest, and without being informed of his rights in the premises, or of the effect of his testimony, are not competent evidence against him in the subsequent trial under indictment for such offense.

The statements and admissions of defendants now under consideration were made, as before set out, while on a train, and while they were in jail. There is no claim that there was any duress of any kind in order to induce the defendants to make the admissions. They appear to have been entirely voluntary, and in conversation with the officers and others having them in charge. The evidence was proper. *State v. Sopher,* 70 Iowa 494, 496; *State v. McLaughlin,* 44 Iowa 82; *State v. Skaggs,* 153 Iowa 381, 383; *State v. Storms,* 113 Iowa 385, 390; *State v. Icenbice,* 126 Iowa 16, 20.

7. An offered instruction on the question of circumstantial evidence assumes that the evidence in the case is wholly circumstantial. Such is not the case. The instruction was, therefore, not applicable. The refusal to give other instructions offered is complained of; but, in so far as they were appropriate to the record, they were covered by those given by the court. There was no prejudicial error in their refusal. Those given by the court were appropriate and correct. We find no error in reference thereto.

8. Complaint is made of alleged misconduct of the attorneys for the prosecution in the opening statement and in the closing argument. In the opening statement, counsel referred to the afternoon transaction. We have seen that this was proper. The alleged misconduct in the closing argument is shown by affidavits of the wife of one of the defendants, and two other persons. While the affidavits are not denied, the court was not asked to, and did not, make a finding as to the truth of the matters set out in the affidavits. Such a finding is required where there is a conflict in the affidavits by counter affidavits. Whether this rule applies where there is no conflict, we need not now determine, since we reach the conclusion that there was no prejudicial error in this regard. Ordinarily, such affidavits are shaded more or less.

8. CRIMINAL LAW: arguments: permissible scope.

The alleged misconduct is that the attorney making the closing argument made an impassioned address, as shown by the expression of his eyes, and that he spoke in a loud voice, and at times patted some of the jurors in the front row, on their knees. There seems to have been no objection at the time. It is said that these matters seemed to have a psychological effect upon the jury, which, as the affidavits say, was apparent to all bystanders. The bystanders do not have the responsibility of the jurors, and are not under oath to determine the guilt or innocence of a defendant according to the evidence and the law, as given by the court. In the instant case, the court carefully instructed the jury that they should consider nothing except what was properly before them. Every lawyer has his own personality, and his own method of presenting his cases. The world is wide. There are millions of different human wills, opinions, ambitions, tastes, and so on; each person has a different history, constitution, culture, and character from all the rest. We are not disposed to lace the attorneys up in strait-jackets and prescribe definite rules as to what they shall say or how they shall say it, or what gestures they shall make, or what would be the proper facial expression. Usually, the attorneys on either side are quite evenly matched, and it would be unfair to permit defense attorneys to soar, and hold the State's attorneys too close to the earth. We seldom have the argument of both sides;

therefore we are not in a good position to judge. The trial court heard it all, and in overruling the motion for new trial, necessarily held that there was no prejudice. We give weight to the judgment of the trial court. *State v. Norman,* 135 Iowa 483, 488. As Mr. Justice Weaver quotes, in *State v. Burns,* 119 Iowa 663, 671, it is the attorney's privilege to

"Drown the stage in tears,
    Make mad the guilty and appall the free," etc.

We think there is no prejudicial error shown as to this feature of the case.

Numerous other questions of minor importance are argued, but those discussed are the more important and controlling. Manifestly, we would not be expected to discuss at length every question presented. The entire case has been given that careful consideration which its importance demands. The case appears to have been carefully tried. We reach the conclusion that appellant was given a fair trial. The jury has found him guilty. With that finding we are content. The judgment is—*Affirmed.*

STEVENS, ARTHUR, and DE GRAFF, JJ., concur.