STATE OF IOWA, Appellee, v. HAYES VAN GORDER, Appellant.

**HOMICIDE:** Murder—Evidence—Sufficiency. Evidence reviewed, and held insufficient to identify the defendant as the perpetrator of a homicide.

*Appeal from Monroe District Court.*—D. M. ANDERSON, Judge.

OCTOBER 16, 1923.

THE defendant was indicted for murder in the first degree. There was a conviction of manslaughter. Motion for a new trial was denied. The defendant appeals.—*Reversed.*

*William S. Hart* and *D. W. Bates,* for appellant.

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien* and *Herbert A. Huff,* Assistant Attorney-generals, and *Miller & Everett,* for appellee.

EVANS, J.—On Sunday night, November 17, 1918, in the city of Albia, A. S. Geesey was murdered by some person, the *corpus delicti* being well proved. Geesey lived alone, in his own residence. The assault upon him occurred out of doors, near the back end of his residence lot. Geesey was the father-in-law of the defendant. The defendant lived at Poplar Bluff, Missouri, several hundred miles distant. Geesey had lived formerly in Allamakee County; thereafter, in and about Albert Lea, Minnesota. From there, he came 10 or 15 years ago to Monroe County. This also was the residential itinerary of the defendant. Geesey left an estate of $12,000 or $15,000, mostly in moneys and credits.

Beginning at 16 years of age, the chief occupation of the defendant, Van Gorder, for many years, was school-teaching. In this occupation he engaged when he first came to Monroe County, and he continued thereat for 5 or 6 years or more. About 1912, he became a clerk in the post office in the city of Albia, and continued as such for about 3 years. By reason of this service, he became well known to the post-office patrons of Albia, and they became well known to him. In February, 1915, he obtained an appointment in the post office at Poplar Bluff, Missouri, and removed to that place. He continued in that position up to the time of the events involved in this prosecution. The personal relations between the defendant and Geesey alternated between times of friction and of good will. Shortly prior to his departure for Poplar Bluff, there had been a breach of good relations between Geesey and his daughter, the wife of defendant. A damage suit was threatened by the defendant, and, as he contends, was compromised by an oral agreement that Geesey should pay the sum of $1,000. Except for a casual meeting in Allamakee County, where each of them happened to visit in 1916, Geesey

and the defendant had not met at any time since the departure of the defendant from Albia. A few weeks before the date of the murder, Geesey came to believe that the defendant had defrauded him in some manner, and that he had, either by forgery or by an impersonation of him through the mail, obtained remittances on Geesey's account from banks in which Geesey had deposits. These remittances were three in number, and amounted to about $1,000. That the defendant received such remittances is conceded, but he contends that they were sent to him by Geesey in discharge of the compromise before referred to. Geesey had put the claim into the hands of Jackley, of Seymour, Iowa, who purported to be a collector of hard accounts on a fifty-fifty basis. Jackley addressed two or three letters to the defendant, the last of which was very peremptory, and implied that time was of the essence of his demand. This was 11 days previous to the date of the murder.

When the murder of Geesey occurred, suspicion was directed at once to the defendant, because of the matters here outlined. An indictment was returned against him, and a trial had, with the result already indicated. The conviction was had purely upon circumstantial evidence, and the important question presented to our consideration is whether it was sufficient to warrant conviction. The theory of the prosecution was that the defendant had obtained three remittances on Geesey's account from banks where Geesey had deposits, and that he had obtained these remittances by forging the name of Geesey. The great volume of evidence upon the trial is devoted to the question of forgery. We have no purpose to analyze the evidence on this issue, or to determine whether it was sufficient to prove forgery. For the purpose of considering the major question, we shall assume the sufficiency of the evidence to show that the defendant had obtained the remittances unlawfully, and that this would tend to establish a motive. We shall devote our consideration to the question of the sufficiency of the circumstances relied on by the State to prove that the defendant perpetrated the homicide. Notwithstanding the large volume of the record, the circumstantial evidence relied on by the State to connect the defendant with the perpetration of the murder could be written upon a single page. Two circumstances are relied on: First,

that the defendant was seen in the city of Albia on the night in question; second, that a man of his stature was seen in the near vicinity of Geesey's premises at or about the time of the murder. If these two circumstances had been well proved, they would have been sufficient to create grave suspicion. Whether they would have been sufficient to justify conviction is a question we defer.

It appears that, on and for some time prior to November 17, 1918, the defendant and other employees of the Poplar Bluff post office were under charges and under investigation by post-office inspectors. On Saturday night, November 16th, the defendant took a train for St. Louis, Poplar Bluff being in the southeast corner of Missouri. Just before going, he wrote a note to the postmaster, asking leave of absence over Monday. His story is that he purposed to go to St. Louis to see the chief who had preferred the charges against him. He also claims that he wanted to see a land agent in that city from whom he had purchased certain real estate by contract. He also proposed to go to Seymour, Iowa, to see Jackley. He came through to Moberly, as he contends, intending to get a train to Centerville, where he believed he could make connection for Seymour. He found at Moberly that he could not follow his schedule, because certain of the trains did not run on Sunday. He therefore returned from Moberly to St. Louis, where he failed to find either of the parties whom he expected to see. He left St. Louis on Monday for Poplar Bluff, arriving there Monday night. The fact that he had left Poplar Bluff at the time that he did and returned at the time that he did, naturally awakened suspicion against him, in that his departure and return were consistent with the theory of the prosecution. The fact also that his trip had been fruitless, and that he had failed in every mission for which the trip was taken, tended to impeach his version of his absence. On the other hand, there was no apparent secrecy on his part in the taking of the trip. Mrs. McCubbin, of Poplar Bluff, with whom the defendant was well acquainted, took the same train. He assisted her and conversed with her upon the train, and told her that he intended to go to Iowa. Mrs. McCubbin was a witness for the State, and testified that she did not see him upon the train beyond Moberly. Her little daughter,

however, who was with her, testified that she saw him on the train after leaving Moberly. Whether her testimony should be deemed anything more than a mere guess, however, is very doubtful. She saw a man ten seats in front of her, whom she took to be the defendant. She did not see his face, but a rear view only. She had never seen the defendant before that time. On the return home from St. Louis, Monday evening, one of the postal inspectors who were investigating the postal case was upon the train, and the defendant visited with him, and told him freely about his trip.

These are the preliminaries necessary to be considered in passing upon the sufficiency of the State's evidence to prove that the defendant was upon the premises of Geesey on the night of the murder. The theory of the State was that the defendant arrived at Albia on a regular train from the south, due to arrive at 7:05 P. M.; that he walked to the premises of Geesey and perpetrated the crime, and returned to the depot and left on a return train south, due to leave at about 10 or 10:30, though it was one hour late on that evening. The residence of Geesey was more than 16 blocks distant from the depot. According to witnesses for the State, it could be covered by a brisk walk in 22 minutes. The murder occurred at about 7:30 o'clock. The exact time was not fixed. It was a dark night, and rain was falling. Geesey lived upon a north and south street, which we will call No. 1. He lived on the east side of it; his house faced west upon the street. Adjoining him on the south lived the witness Crowell, whose residence faced the same street. Back of these residences was a north and south alley. Across the alley east from Geesey's residence lived the witness Kellogg. His house faced east upon the other street, which we will call No. 2. The rear of Kellogg's premises abutted upon the same alley as did those of Geesey. Adjoining Kellogg on the south, and facing the street No. 2, was another residence. The rear of this lot abutted upon the common alley, opposite the residence of Crowell. On the east side of the street No. 2 was the residence of Harding, wherein the witness Mrs. Smith was engaged as a nurse in attendance upon a sick child. The coroner described the wounds of Geesey as two pistol wounds in forehead and one in abdomen. The evidence discloses a reference to only

one bullet. This was in the abdomen, where the mortal wound was inflicted. The first person to discover the wounded man was Crowell, who testified:

"Heard Geesey holler, and I hollered and asked who was there, and he said: 'Come quick; something awful has happened.' He was staggering toward house, and fell in my arms. Said *someone* had knocked him down twice."

Kellogg, who lived across the alley just east of Geesey, testified that he "heard one shot. Saw two men near Geesey closet. Recognized Geesey. Other man heavy built. Big and heavy, but not tall; five feet six or eight inches."

Mrs. Smith testified:

"Night of murder, was at Harding house, across street from my home, caring for sick child. Heard shot, and looked out of window, and then went and sat at bedside of patient, and saw man passing down street, going south on west side of street. Walking pretty fast. Low, heavy-set man."

"Q. Now, Mrs. Smith, what would you say as to whether the man you saw passing south along the street, as you have indicated, appeared in stature and general appearance as to weight with the defendant Hayes Van Gorder? A. He would fit the description very well."

Cross-examination. "Dark, drizzly night. When I heard shot, went to window and looked out, and then went back and sat down with sick child, and while sitting down, somebody walked south, along west side of street. Street is regular thoroughfare, built up on both sides, and people pass along it at all times. * * * Man wore dark coat, light trousers, no overcoat."

The foregoing is all the testimony which tends to identify the defendant as the man who was upon the Geesey premises. Whether the defendant was a thick-set man or not does not appear in the evidence. It does appear that his height was five feet eight and one-half inches, and that of Geesey was five feet ten inches. Turning now to the purported identification of the defendant at the depot, the witnesses to this identification were the three members of one family, being Mr. and Mrs. Shaw and their son, a lad of thirteen. Mr. Shaw was engaged in the grocery business, and knew the defendant when he was employed in the post office. He also knew him as a customer of his store.

The wife and the son did not know the defendant, and had never seen him before. They had come to the depot about 10 or 10:30, to meet the train upon which their daughter was about to arrive, and upon which the defendant is supposed to have left. The train was an hour late, and they were detained for that length of time. Mr. Shaw testified:

"Noticed traveling man I was acquainted with, and talked to him. Saw man that resembled Van Gorder standing in corner near radiator. Probably six feet from ticket window."

"Q. What would you say, Mr. Shaw, from what you saw of the man there you describe and speak of, as to whether, in your best judgment, he was the defendant, Hayes Van Gorder? A. Well, from his build·and his appearance and all, he has the same appearance and build as Mr. Van Gorder,—this man I saw that night."

Cross-examination. "Heard about 9 o'clock that Geesey had been killed. Knew that Van Gorder was Geesey's son-in-law, and that they had lived together. Went to station with wife about half hour after I heard that Geesey was killed, and Geesey's murder was fresh and vivid in my mind when at the station. Man at register was probably fourteen feet from me in station. Seemed chilly, like a man that came in out of the cold. Recollection now is that he was a man about size and height of Van Gorder, and that is practically all the knowledge I have with reference to the matter."

Redirect examination.

"Q. Following the arrival of the train, and on your way to your home, and at your home, was there any discussion between yourself and wife and the members of your family relative to this man whom you had seen at the depot? A. I did in a way,—that is, temporarily, you see. Q. And what was that? A. Well, that it might have been Mr. Van Gorder."

Mrs. Shaw testified:

"Saw defendant come in west door and buy ticket to St. Louis and come back and stand over register at east side of depot. Wore no overcoat, and had a soft hat."

Cross-examination.

"Never knew Van Gorder before. Entire stranger to me.

\* \* \* Remember no man in station except Van Gorder and traveling man my husband was talking to. There were others there, but I did not pay attention. \* \* \* Never had seen or heard of Van Gorder before. Noticed he wore a slouch hat. Paid no attention to hat traveling man wore who talked to my husband. Don't know whether other men wore hats or caps.''

The son testified: ,

''Age 13. Went to station with father and mother at night, to meet sister coming from Des Moines. Saw Van Gorder there, and buy his ticket for St. Louis. He went out, and came in again, and stood over on east side of register. Wore dark felt hat, kind of down over eyes.''

### Cross-examination.

''Had never seen him before. Just saw somebody at station. No idea who it was. Good many other people at station. Can describe no one else. He wore black shoes.''

The foregoing is all the evidence which tends to identify the defendant in any manner at this point. Except the evidence tending to show motive, the foregoing is all the evidence in the record which tends to prove that the defendant was the perpetrator of the crime charged.

As already suggested, the coincidence of the time of his departure from Poplar Bluff and his return thereto with the time of the murder tended to excite grave suspicion. The explanation given by the defendant was not wholly plausible, and this would confirm the suspicion. If it could be said, upon the foregoing evidence, that he did visit Albia on that occasion, the circumstance would be very suggestive, and would put a very grave aspect upon the suspicion already existing. Needless to say that even the fact of his presence in Albia, if proved, would not have been sufficient of itself to raise any presumption that he perpetrated the crime. It was incumbent upon the State to show a chain of circumstances which would admit of no other reasonable hypothesis than that the defendant perpetrated the murder. The evidence of Kellogg that he saw a short, thickset man with Geesey was admissible, and might have had an important bearing, as corroborative of other evidence. It did not purport to identify the defendant. That of Mrs. Smith,

who saw a short, thick-set man walking down the west side of street No. 2, is more remote than that of Kellogg. That, too, might have had its value as corroborative of more definite evidence. As substantive evidence, it amounted to almost nothing. The testimony of the members of the Shaw family is very unsatisfactory, as proof of the major circumstance relied on for conviction. Mr. Shaw knew the defendant. He knew that he was the son-in-law of Geesey, and knew that Geesey had just been murdered. He saw the man whom his wife saw. He was not able to say that it was Van Gorder. The utmost that he could testify to was that the man he saw resembled Van Gorder in appearance and build. If Shaw himself, who knew Van Gorder, was not able to say that the man he saw standing close by him was Van Gorder, how could the jury say so, upon his testimony? Mrs. Shaw and the young son did testify with positiveness to the identification, but neither of them had ever seen Van Gorder before, and neither of them had ever heard of him before. Under such disability, was their evidence rendered any stronger by its positiveness? Their descriptive evidence was admissible. The purpose of such description would be to show that it was the same person that had been described by Kellogg and by Mrs. Smith. Mrs. Smith described him as wearing light trousers. This feature of his dress escaped the notice of the latter witnesses. Their description of his dress was that he wore no overcoat, and had a soft hat and black shoes. For aught that appears from their testimony, such description would fit the dress of every man that appeared in the depot that evening. Neither of the witnesses noticed the dress of any other person. At best, the testimony was significant only for the inferences which might fairly be drawn therefrom which would connect defendant with the crime. The proper extent of such inferences would, of course, depend upon the evidence as a whole, and would necessarily take account of every circumstance appearing therein, whether great or small. We have already referred to all the circumstances which tended to cast suspicion upon the defendant and to justify unfavorable inferences. As against these, a number of circumstances appeared in the State's evidence which tended to negative the defendant's connection with the crime. It appeared, for instance, that the post-office inspec-

tors who were engaged in the investigation of the charges against the defendant for irregularities in the post office at Poplar Bluff were advised on Monday of the death of Geesey and of the suspicion directed against the defendant. Under the guise of pursuing their post-office investigation, they subjected the defendant to a quiz, calculated to obtain light upon the Geesey murder. On Tuesday morning, they took him in virtual custody into the "basement" of the post office. By successive examinations, they subjected him to what is sometimes called the "third degree." He committed himself thoroughly by answering all questions. They put his story into writing, and took his·signature thereto. They searched his person and his residence, and took possession of every paper and every article that they could find which could have any evidentiary value. The State retained the possession of these during the entire period covered by the prosecution. Nothing incriminating was discovered. The paper which he signed for them was not offered in evidence. The statements made by him were consistent with his subsequent testimony. They found no sign of firearms or cartridges. The testimony on defendant's behalf was that he had never owned a firearm of any kind, and had never used one. This was not contradicted. If he shot Geesey, he must presumably have bought or borrowed the revolver. This would have rendered evidence available against him. If he shot Geesey, the revolver must have remained in his possession, or must have been thrown away. The finding of a revolver would have been a very important item of circumstantial evidence. Though it would not be essential as a matter of law, yet the absence of such evidence cast upon the State the burden of supplying the deficiency by a sufficient showing of other incriminating circumstances.

It appeared also that the first person to discover Geesey after the assault was Crowell. When Crowell found him, he was still on his feet. He said to Crowell that *someone* had knocked him down twice. What Geesey said at this time is an important circumstance. It shows that Geesey had not recognized his slayer. Kellogg's testimony shows that the two men were together. The other man was apparently not disguised; neither was the man seen at the depot disguised. If it was Van

Gorder, he was not wearing a mask. The fact that there were two wounds upon Geesey's forehead would corroborate the statement of Geesey. Though the coroner described those wounds as pistol wounds, they were not so described by the other physicians. Only one shot was heard by anyone. One bullet penetrated the abdomen, and caused the mortal wound. The testimony of Kellogg and the statement of Geesey show that the assailant was close to Geesey, in the assault. It is the natural inference that, if the assailant had been Van Gorder, Geesey would have recognized him. Nor can it be too readily inferred that Van Gorder would have presented himself to such close view of Geesey, if he was intending to assault him. And this is especially so where it appears that the victim was still living and able to talk and to disclose his assailant when the assailant left him.

The fact, therefore, that Geesey did not recognize Van Gorder as his assailant is an important circumstance, which tends strongly to negative the unfavorable inferences that might otherwise be drawn. The assault occurred at about 7:30, and not later than 7:40. The train on which Van Gorder was supposed to have come was due at 7:05. It was a dark and rainy night. Geesey lived more than a mile from the depot. The testimony for the State is that the distance could be covered by a brisk walker in 22 minutes. The testimony implied favorable circumstances for such walk. Whether darkness and rain would impede the progress of a pedestrian is left to mere inference. The inference is a very difficult one that Van Gorder could have got from his train to the home of Geesey under such conditions by 7:30. It is still more difficult to infer that he would have gone promptly to the back end of Geesey's lot and there found Geesey. Granted, however, that all this was possible, it was not possible that he could have avoided the effect of the weather upon his clothes. When he returned to the depot, according to the State's theory he must have been exposed to the rain for a period of not less than one hour. There must have been some evidence of this exposure upon his hat and upon his clothes and upon his shoes. No such evidence was discovered by any witness. We mention these additional circumstances, not to show the innocence of the defendant, but to show that

they do not aid the State as links in the chain of circumstantial evidence. The verdict of the jury was for manslaughter. There was no evidence in the record which would justify the jury in saying that the slayer of Geesey was guilty of any lesser crime than murder. We can regard the verdict of manslaughter only as a reflection of the jury's reasonable doubt that the defendant was guilty of the slaying of Geesey, though it may have believed that he had been guilty of a forgery.

It is our duty to scrutinize circumstantial evidence more critically in a criminal case than in a civil one. In either case, we are bound to say whether the evidence is sufficient to sustain an affirmative finding by the jury. *State v. Billings,* 81 Iowa 99.

Inasmuch as we have assumed in the foregoing discussion, without so deciding, that the evidence in the record is sufficient to sustain a finding that the defendant had been guilty of forgery, it is due him to note that he put his general moral character in issue, both in Allamakee and Monroe Counties, and sustained the same by the testimony of fourteen witnesses. These included a county superintendent, a chairman of the board of supervisors, a minister of the gospel, school-board members, and other business men apparently disinterested. The State offered no character evidence.

It is our conclusion, upon a careful consideration of the entire record, that the evidence for the State was insufficient to sustain the verdict, and that the motion for a new trial ought to have been sustained and a new trial granted. The judgment below is, accordingly, reversed.—*Reversed and remanded.*

PRESTON, C. J., ARTHUR and FAVILLE, JJ., concur.