Sᴛᴀᴛᴇ ᴏꜰ Iowᴀ, Appellee, v. W. S. Fʀᴇɴᴄʜ, Appellant.

No. 47244.

(Reported in 35 N. W. 2d 1)

2

DECEMBER 14, 1948.

A. L. Heminger, of Keosauqua, and Thoma & Thoma, of Fairfield, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and W. J. McConnell, County Attorney, for appellee.

BLISS, J.—Before discussing the errors assigned and the contentions of the parties we will set out the facts, as they are the most important factors in the case. They are a part of several incidents.

Snell, fifty-seven, who signed the information, is a veterinarian in practice since 1915, and lived at Donnellson, Lee County, Iowa. Defendant, sixty-two, married man, with a son and granddaughter, lived at Farmington, Van Buren County, Iowa, since he was a young man. Ed W. Hartrick, sixty-two, lived at Farmington. These men were horse dealers, and particularly, so far as this record shows, except for a temporary venture, were breeders of and dealers in registered saddle horses.

The side venture arose in the summer of 1946 from a verbal contract that Snell had with the Abbott Laboratories of Chicago for the shipment of the urine of mares produced during the period of ninety days immediately following the first four months they were in foal, to be used in the production of hormones for medical purposes. Snell and French entered into a verbal agreement between themselves to furnish this product. Each was to furnish half of the mares, divide the expenses, and share the profits fifty-fifty. Snell entered into a written lease for the house, barns, lots and pasture, where the business was to be conducted, on the Cartnal farm outside of Farmington, for a term of sixteen months. Snell sent French west with $900 to buy a carload of branded western mares for Snell. He did this, and also brought a carload for himself. There were twenty-nine mares in each load. One Muntz was hired to operate the business and to breed and care for the mares, but during most of the year 1947, this work was done by Hartrick. Each partner used some of his registered mares in the business. Hartrick and French had operated together in the horse business for some years and owned some registered animals together, and these mares were used in the urine business, and Hartrick had an interest in the fifty per cent share of the profits which French was to receive.

In August 1946, French procured for, or sold to, Snell ten mares and two colts. They were mostly just ordinary horses, some western, and all unregistered. In payment Snell gave French his check for $985 dated August 14, 1946, which was

4

paid. On its face these words are written, "For 10 mares and 2 colts." The check is Exhibit P-2. As further evidence of this transaction French gave Snell a memorandum describing each mare by color and age, as follows:

"Chestnut mare—12 yr.    Chestnut mare                —5 yr.
 Chestnut mare—14 yr.    Chestnut mare and horse colt—7 yr.
 Chestnut mare—11 yr.    Black mare and mare colt     —8 yr.
 White mare    — 6 yr.    Bay mare                     —2 yr.
 Grey mare     — 6 yr.    Chestnut mare                —8 yr.
                    Received payment for same—W. S. French."

This paper is Exhibit P-3.

In November 1946, French bought for, or sold to, Snell twenty-one branded western mares. What the real consideration for this transaction was does not appear. No bill of sale was executed for either of these transfers at the time it was made, but, as will hereinafter appear, Snell, on October 26 (Sunday), 1947 had a bill of sale drawn evidencing each transaction, which was executed and acknowledged by French on the date last stated, but the acknowledgments were stated therein to have been made on October 25 (Saturday), 1947. The bill of sale for the ten mares and two colts was dated July 1, 1946— it is Exhibit P-11—and the bill of sale for the twenty-one horses was dated November 18, 1946. It is Exhibit P-12. The defendant offered in evidence Exhibits P-11 and P-12. "Mr. McConnell: I don't think either of these is admissible. That is the reason I didn't offer them." The objection was sustained, but later Exhibit P-11 was received when reoffered by the defendant.

In December 1946, French and W. I. Chrissinger, a farmer in the vicinity who had some interest in saddle horses, went to Goren, Missouri, and French contacted Nick Ewing, whose boy worked for Pickens-Burton of Dallas, Texas, which was engaged extensively in the breeding and sale of horses. French testified that Mr. Ewing was assisting his boy in making sales of horses for the Dallas firm and on December 18, 19, 1946 he bought three registered mares through Nick Ewing, for $900, plus a $200 commission to Ewing, which he paid, and he borrowed $300 from Chrissinger as a down payment on the mares. Chris-

singer gave his check on a Donnellson bank, dated December 19, 1946, for $300 payable to Nick Ewing. On its face are written words: "Payment $300.00 on 3 mares at $900.00." The check was paid. It is Exhibit P-13. The three mares were registered: As Issie's Genius, No. 26592, foaled April 16, 1937, chestnut, white star, white left hind ankle, certificate dated March 15, 1938, with three recorded transfers including the last one to French; as Anacacho Connie, No. 23803, foaled June 19, 1935, bay, white star and snip and white right hind pastern, certificate dated December 31, 1935, with three recorded transfers including the last one to French; and as San Nickolena, No. 23436, foaled September 15, 1935, bay with no markings, certificate dated September 15, 1935, with four recorded transfers including the last one to French. The certificates of registration for each mare, with the assignments showing each transfer of the mare were attached. The last assignment on each certificate was signed "Pickens-Burton" to W. S. French. One bore the date December 18, 1946, and the other two, December 19, 1946. French testified that the registration and transfer papers were delivered to him on December 19, 1946, when Chrissinger was with him, and that later Ewing brought the three mares and a fourth mare to Farmington and delivered them to French. The fourth mare had been bought by French after the purchase of the three.

Of the Missouri transaction in December 1946, Chrissinger, as a witness before the grand jury, testified:

"At the time the mares were purchased I made a down payment of $300 on them *for W. S. French, who did not have the money.* * * * When the balance was paid, the mares were to be taken to the Cartnal farm, but the registration papers were to be made to me to hold *until French paid me the $300.* * * * After my check had cleared, I found the mares had been transferred to French. *I told French I would not give him the rest of the money to pay for the horses, so he told me he would get it from Dr. Neil Snell."* (Italics supplied.)

The plain import of this testimony is that French bought these horses, and Chrissinger was merely aiding in the financing.

But Chrissinger told a different story as a witness for the State. He then testified:

"I made a down payment on the three mares. I sent it down to Nick Ewing. *We* bought the mares—French wanted them paid for. He didn't have the money. I told him I would pay for them and hold the pedigrees and any time he wanted to buy them back he could. I took French down there. *Wasn't any more bought by him than they were by me, as far as that goes.* The $300 was a payment on the horses. *I was buying the horses.* Never finished paying for them as he took the pedigrees. * * * I never had the horses in my possession. * * * There were four mares brought up—an old black mare I had nothing to do with at all." (Italics supplied.)

Whether French ever repaid the $300 to Chrissinger is not disclosed in the record. Neither does it appear that Chrissinger ever demanded the money or the mares or made any claim to them.

The sale price of the old black mare was $150. The balance owing on the three mares was $600. French testified:

"I paid the balance with the urine check I got off Doc. Snell for $750. I had paid the commission of $200 and $300 I got from Chrissinger. * * * That $750 check from Dr. Snell was what Doc owed for urine. Doc was the paymaster for all of it. We had about two shipments we hadn't received pay for. I had seven or eight [checks] made from Snell to whoever I wanted it made for. This check as far as Snell and I was concerned was given to me for Ewing and was charged against me on my share of the urine contract. Doc never even knew Ewing that way. I told Doc how to make it out. Told him who I wanted it made to. I took it down to Ewing and delivered it to him personally. * * * These three animals that I dealt with Ewing for were delivered to me personally. Nick Ewing phoned me and I met him on the gravel about a mile and a half the other side of Farmington with a truck and took them over to the Cartnal farm and kept them there. Ed Hartrick has a half interest in them. As to these three animals the agreement between Ed Hartrick and me is a fifty-fifty profit."

The Snell check for $750 was drawn on the Donnellson bank payable to Nick Ewing and bore date of February 1, 1947. When it was produced by Snell and introduced in evidence by the State, these words had been written on its face, "For four mares, 2 bay, 1 sorrel, 1 black." French testified that the notation was not on the check when he received it, and that it is written in different ink from the other writing on the check. In the State's rebuttal, Snell denied the alteration, and also denied that he told French the check was in payment of anything due him under the urine contract. He testified to nothing else, and made no other denials in his rebuttal testimony.

In October 1947, Snell and French prepared, had printed, and posted, bills, over their names, advertising a horse sale at public auction to be held by them at the Cartnal farm on October 28, 1947, consisting of sixty Saddle Bred Horses, of which twenty-two were listed in separate numbered paragraphs giving the name, the registry number, if registered, date foaled, and the breeding. Some were eligible for registry, but not registered. Registration papers were to be furnished with all of these. The twenty-two animals consisted of nine stallions, matured and colts, eight matured mares, and five fillies foaled in 1946 and 1947. Only the mares could be used in the urine business. In addition to those specially listed the sale bill referred to about forty colts and horses broke to ride.

Snell testified that he made an appointment with his lawyer, R. N. Johnson, Jr., in Fort Madison to meet him at his office on Sunday, October 26, 1947. On that day he went to French's house and took him to the lawyer's office. Snell had with him Exhibit P-3—the list of the ten mares and two colts for which he had paid French $985 on August 14, 1946. He had the lawyer prepare a bill of sale from French to him describing the animals exactly as set out in Exhibit P-3, and dating the instrument, July 1, 1946. This is Exhibit P-11 hereinbefore referred to. Snell also had with him a description, simply by color and age, of each of the twenty-one branded western mares, which French had bought for, or sold to, Snell in November 1946, and he had the lawyer prepare a bill of sale from French to Snell, describing each animal only as just above noted. This bill of sale was dated November 18, 1946. It is Exhibit P-12 herein-

before referred to. When Snell asked French to execute the instruments, the latter inquired what the purpose was, and Snell testified that he told French that he had not planned on selling urine the coming winter, and he did not want anyone to attach the horses during the public sale and he wished to have the bills of sale put on record. French executed and acknowledged the instruments on Sunday, October 26, 1947, but the acknowledgments were dated October 25, 1947. Whether the reason given by Snell for wishing the papers executed was the real reason may be open to question. He had owned the horses in the first bill of sale for sixteen months and those in the second for almost a year. He had disposed of a number of them. Furthermore, these instruments covered few if any of the horses offered for public auction. Certainly, none of the horses which was registered or eligible for registry, and described in the sale bill, was covered by the bill of sale.

On October 27, 1947, French telephoned the Abbott Laboratories and was informed that their present plans were not to buy any urine during the next year.

The public sale was held as advertised. Hartrick and Snell were the clerks. But it was a rainy day and few came. San Nickolena, one of the Dallas, Texas, mares, being the first animal listed on the sale bill, was the first offered for sale. No satisfactory bid was received and the mare was withdrawn from sale. Attached to defendant's motion for new trial was the affidavit of a farmer and saddle horse breeder and trainer from Des Moines county stating that previous to the sale he had inspected the mare San Nickolena and asked French to put a price on her but French told him he did not care to sell her. On the day of the sale after French had refused to accept the highest bid made for her the affiant publicly asked French the least he would accept for her, and he replied not only to him but openly to the crowd that he would take $600 for her, and that Snell was present and heard everything that was said and showed no interest. Another such affiant, who operated a Saddle Horse Training Stable in Donnellson, testified that Dr. Snell had a barn leased near his stable, and in September 1947, he asked Snell if he would take a bid of $400 over to French on the stallion colt out of San Nickolena which he had previously asked French

to put a price on. Later he stated that Dr. Snell brought him a reply to the effect that French made fun of the offer, and that he, Dr. Snell, was unable to get a price, and that French told Snell the colt was not for sale then. This colt was No. 11 in the sale bill, and was named "All Stonewall's Juan, bay stallion, foaled February 12, 1947. Sire, All Stonewall, Dam, San Nickolena." The affiant said that he had never heard Dr. Snell make any claim to the mare or colt.

Snell testified that when French asked him for the $750 he told him one of the mares was worth more than the other three. Apparently there was basis for the remark, and it bears on the unlikelihood of his selling the four mares to Snell for $750, as claimed by Snell, and hereinafter referred to. Both French and Snell had horses listed on the sale bill. Only about ten or twelve colts were sold. Half of them belonged to Snell, and half, to French. No other horses were sold.

Snell testified that shortly after the sale they took some of the horses to Kirksville and sold about a dozen of the registered or eligible ones, and sold fourteen mares of the "40 colts etc.," listed on the sale bill, at Donnellson, and that some that were not sold he took to his home and others he left at the Cartnal farm. Snell and Cartnal had canceled the lease on November 1, 1947, but Snell was privileged to leave any horses remaining until disposed of. Hartrick was caring for the horses as he had been all year, to Snell's knowledge. Hartrick lived in Farmington, as did Cartnal, who operated the farm, but had no care of the animals kept there by Snell or French, or used in the urine business. Snell according to his affidavit of December 12, 1947, made in anticipation of defendant's motion for continuance, stated that he had sold his home and was going to make his new home in the state of Washington, where he had accepted employment beginning December 1, 1947.

The foregoing statement of facts, as fairly shown by the record, discloses the background, and also the situation existing on November 14, 1947. Respecting the horses then in charge of Hartrick, Snell testified: .

"I had Cartnal put these animals in the lot on the night of November 14th. I planned to truck them out of there early

in the morning. I did not say anything to Will French about it. I had not said anything to Ed Hartrick about it. I was going to put them in a different pasture, closer home, of George Chaney south of Donnellson.

"Q. You were proposing to move them out of the country, weren't you Doctor? A. Yes, sir. Q. And you say that you knew Will French claimed to own these animals that were moved away? A. He claimed to own everything."

In compliance with Snell's request Cartnal put the remaining horses, one colt and twelve head in the corral, and one in the barn. He said he knew nothing about their ownership. It was a rainy night and the roads were almost impassable.

Glenn Jennings, the trucker employed by Snell to remove the horses, saw fit to report to French what was planned. French testified that the report was that Snell was going to move the horses from the Cartnal farm and that he was leaving the country. He called Hartrick to his home and told him what Jennings had reported, and that he should get over there at once and take their horses away.

Hartrick testifying on direct examination for the State said French told him that:

"Snell was going to move those horses from the farm the next morning before daylight, and that I better get out there and look after them. Said Snell had two trucks going out there the next morning before I got there. He said to take them over to Chrissinger's if I could. We talked about some of the horses. Mother McDonald * * * the three mares purchased of Nick Ewing * * * the colt of one of the bay mares from Missouri * * *.

"Q. Mr. Hartrick, you have been in the horse business with French for several years, haven't you? A. Yes, sir. Q. Under your arrangements you do most of the physical work in connection with any horse transaction you have? A. Most of it, yes. Q. Mr. French often told you what to do with the horses, where to take them, and so forth? A. Quite often, yes. Q. When Mr. French told you to take the horses was anything said about Snell owning any of these horses there? What

did Mr. French tell you, if anything, about that? A. Well, I asked him to go along, *and he said he would have to be there to see Snell the next morning.*" (Italics supplied.)

Hartrick went to the Cartnal farm about ten p.m., November 14, 1947, and took from the horses in the corral seven mares and a colt and placed them in the barn lot of the George Fixel farm just across the road from the Cartnal farm and up a little ways—a distance of 400 yards from where he had taken them. The next morning about ten a.m. he went back to the Fixel farm and took the horses to the W. I. Chrissinger farm and put them in the pasture, and soon after the sheriff came out and arrested Hartrick and took him to Farmington.

The horses which Hartrick took were all registered, or eligible for registry in the American Saddle Horse Breeder's Association. Their descriptions, as shown by their registry certificates with recorded transfers, are: (1), (2) and (3) the three Texas mares, Issie's Genius, Anacacho Connie, and San Nickolena, already described above (4) Mother McDonald, No. 29783, bay mare with no markings, foaled June 3, 1934, certificate issued to Frank Witcher, July 2, 1940, and by him assigned to F. M. Story of Kahoka, Missouri, and by Story assigned to W. S. French of Farmington, Iowa, September 16, 1944, and recorded October 5, 1944 (5) Van Buren Queen, No. 36988, chestnut mare, markings—short stripe, both hind stockings white, foaled May 16, 1941, bred and owned by W. S. French, P.O. Farmington, Iowa, certificate to W. S. French dated September 14, 1944, and no transfers. (6) Lady Redlight F, No. 37350, bay mare, markings—star, both hind ankles white, foaled April 2, 1944, bred and owned by W. S. French, P.O. Farmington, Iowa, certificate to W. S. French dated March 16, 1945. No transfer is shown (7) Anna Chief F., No. 36898, bay mare, markings—star, left hind ankle white, foaled September 2, 1931, bred by owner W. S. French, P.O. Farmington, Iowa, certificate to W. S. French dated August 14, 1944. No transfer is shown (8) Was a mare colt, foaled by Anacacho Connie in May 1947 on the Cartnal farm and always kept there.

French testified that in the morning of November 15, 1947, he was on the way to the post office in Farmington to mail some

12

letters, when Mr. Swailes, the sheriff, told him of the horses being gone and asked what he knew about the matter. French testified that he did not know just where Hartrick might take the horses—possibly to Hartrick's brother's place or his brother-in-law's place—and he told the sheriff he would find out shortly and let him know. The sheriff's testimony, as a witness for the State, confirms this. The sheriff also testified that while he was eating lunch at a restaurant, French, who was also eating, came over to his table and asked if he had found the horses and if Ed Hartrick was with them, and he told him he had found them and Ed was with them and he had arrested him, and French said "we couldn't do anything about it, as they were Ed's and his horses." The sheriff testified that sometime later when he had arrested French on the charge of embezzling the horses, and had him in jail French told him he did not have a cent in the horses. French denied making any such statement.

The sheriff testified that when Snell went to the farm in the morning of November 15 and found part of the horses gone he telephoned him of that fact and said he would sign an information against anyone found in possession of the missing horses. On or about November 17, 1947, Snell signed the information charging French with embezzlement of the horses.

At or about the same time he consulted attorneys at Keosauqua and had a petition prepared in replevin for himself as plaintiff against W. S. French, E. W. Hartrick and W. I. Chrissinger, as defendants. In his petition, which was verified by Snell, he alleged that he was the owner of and entitled to the possession of forty-one horses, as "confirmed by certain bills of sale, copies of which are hereto attached, marked Exhibit 'A' and 'B' respectively." The petition alleged that the defendants wrongfully detained the horses for reasons unknown to him. He prayed for a writ to recover possession of the horses, and judgment for $4000 as damages for their detention. Exhibits A and B, referred to in the petition and attached to it, are respectively the bills of sale Exhibits P-12 and P-11, which were executed on October 26, 1947. The petition describes thirty-one of the horses exactly as described in those instruments—by color and age. Each is valued at $60. The remaining ten horses are

specifically described by name and registry number, if registered, and they include four of the horses taken by Hartrick on November 14, 1947, to wit, Mother McDonald, Anna Chief F, Van Buren Queen and Lady Redlight F. The other six horses we are not concerned with. These ten horses are valued at $250 each. The four mares named are not described in or transferred by either bill of sale. This is shown conclusively in the record. It was admitted by Snell. His testimony respecting this replevin action is illuminating as to the conduct of Snell and the character of his claims.

The following is a part of his cross-examination:

"All of the animals described in Exhibit P-12 are western branded mares. I don't claim any of these animals described in Ex. P-12 were among the animals that I have charged Will French with taking from the Cartnal farm and covered by this indictment. There is no claim of that kind.

"Q. Now, as a matter of fact, all the animals covered by Ex. P-11 have been sold, haven't they? A. I don't know where they are. Q. You don't know whether they are sold or not? A. I don't know where these horses are. Q. You couldn't identify them to save your neck, could you, Doctor? A. No. Q. You don't know, do you? A. No. Q. All the animals described in P-12 are sold? A. Yes. Q. They are all sold? A. Yes. Q. You are making no claim about them in this case? A. No, not in this case. Q. Well, now let's see Doctor, you brought a civil suit in court here, didn't you? A. Yes, sir. Q. In which you sued Bill French for all of these animals? That's right, isn't it? A. Yes, sir. Q. So that you are suing Bill French then in this court for a lot of western branded mares, that you have already sold, is that right? A. They put the whole list down. Q. Who do you mean by 'they'? A. Attorney. Q. You swore to this petition? A. I suppose I did."

On being shown the petition and verification, Snell admitted that he swore before J. B. Stong on November 18, 1947, that the allegations of the petition were true.

"Q. And now you say that a good portion of these western mares described in this petition had previously been sold by

you? A. I made that known to Mr. Stong at the time and he said that had no bearing on it. Q. Do you blame Mr. Stong for it? A. He said it had no bearing. He just wanted a list of the whole thing. Q. Did you read the petition? A. Yes, sir. Q. And you swore to that petition in spite of the fact that you had previously sold most of these animals, *possibly all of them with the exception of three,* is that right? A. Yes, sir. Q. And in that same petition you ask that you have a writ of replevin from this court to recover possession of some animals that you yourself had previously sold? A. Yes, sir." (Italics supplied.)

There were four, instead of three of these horses, which Snell had not sold. They were Mother McDonald, Anna Chief F, Van Buren Queen, and Lady Redlight F which the evidence, including that of Hartrick, a witness for the State, clearly establishes were never owned by Snell, but were at all times pertinent the property of French and Hartrick.

Here is part of the cross-examination of Hartrick. It was proper cross-examination, and also went in without any objection by the State:

"Q. Did you have some interest in these seven mares and colt you moved that night? A. Yes, sir. Q. Who else had some interest in them? A. French and I together. Q. That is Will French [the defendant in this case]? A. Yes, sir. Q. Is it a fact that you and Will French together owned those seven mares and that colt together, is that correct? A. Yes, sir. Q. So when you moved this property off the Cartnal farm that night after you had been informed that Dr. Snell proposed to move it away early the next morning, you moved property that you had an interest in? A. Yes, sir. Q. Is that fact the reason you went out there about 9 or 10 o'clock that night and moved those animals across the road to the Fixel place? A. Yes, sir. * * * I was employed regularly before the time I moved these animals in caring for them on the Cartnal place. I was there every day. I fed the horses in the barn. I watered the mares in the pasture. Had to pump water for them every day, see that they had water in the tank. I

would breed the mares. I was there just at the end of the urine production season. The man that was there didn't give satisfaction. They wanted me to go over and oversee it. French and I owned these mares for several years. * * * These three animals that came from Missouri there was an arrangement between French and me and I was to care for them and I was to participate in the profits on the colts and sale. I did that. I was to have half interest in them. Will French told me he had the registry papers on the animals."

Redirect examination:

"For some time I have been working with French and had a kind of an arrangement with him in the buying and selling of horses. At the start I furnished money for it. I have not furnished any lately. French was the one that did the buying and selling. That was supposed to be his part of it. * * * I never had any transactions with Dr. Snell. I was working there for my share and interest in the urine if they had any. * * * I didn't have any money in these horses purchased from Nick Ewing in Missouri. * * * French told me to take those horses over to Chrissinger's. He said he had to talk to Snell about them."

On re-cross-examination, the witness testified that his arrangement and contract and partnership with French was to share in half of the urine profits as well as these horses; that it was his understanding and claim when he moved these seven horses and colt that he and French owned them; that they owned four of them for several years, and the three Missouri mares were to be paid for out of the urine contract. On re-re-cross-examination, the witness testified:

"I had originally furnished part of the purchase price on some of these other animals. I participated in the purchase price cost of those animals. I had right around $800 or thereabouts, and there was one raised. The rest I furnished the actual cash to buy them with. My recollection is it was some $800. * * * Sometimes the profits went to buy other horses."

The court examined him to the extent of about twenty-five

consecutive questions as to the acquisition of his interest in horses with French.

While the extent and nature of any interest of Hartrick in any of the horses involved in the alleged larceny may be pertinent, the real question relative to ownership is whether Snell owned any of them. Snell has not been consistent or definite in his claims. As the prosecuting witness before the grand jury he testified: "Four of the mares taken were part of the mares originally purchased from French and for which I had paid him $985." The animals in that transaction were described by color and age in the memorandum, Exhibit P-3, in Exhibit P-11, one of the belated bills of sale of October 26, 1947, and in Exhibit B of the replevin petition. As a trial witness his story differed from his grand-jury version. On direct examination by the State he testified:

"Q. Do you know the names, Dr. Snell, of any of the horses for which you gave the check Ex. P-2, for $985? A. No, I do not, not the registration name. Q. Can you answer the question, Dr. Snell, whether or not any of the horses which were taken on November 14th from the Cartnal farm, were any of the horses for which you paid Mr. French the $985? A. The only one I can identify is Mother McDonald. Q. Was that one of the horses which you originally purchased from him for your check of $985? A. Yes. Q. I hand you Ex. P-3, Dr. Snell, and ask you to state whether Mother McDonald is one of the horses listed in that paper?" Evading somewhat, he answered, "Supposed to be." The State left him with that indefinite answer.

Let us see if she was "supposed to be." Exhibit P-3 is set out above in full. Each of the ten mares is described therein by color and age. According to Mother McDonald's registry certificate she was a bay mare with no markings, foaled June 3, 1934—age twelve years plus when Exhibit P-3 and the check for $985 were written. The only bay mare listed in Exhibit P-3 was two years old.

On redirect examination, the State again discussed Mother McDonald with Snell:

"Q. Dr. Snell, in regard to these first horses which you purchased from French for which you gave a check for $985, did Mr. French tell you the name of any one of these horses? A. Only one. Q. What was her name? A. Mother McDonald."

Without pursuing the matter further through the pages of evasion and equivocation by Snell in his re-cross-examination, the examination terminated thus:

"Q. And the twelve animals you did buy are described in Ex. P-3? A. Yes, sir. Q. And the twelve animals which you did buy are described in Ex. P-11? A. Yes, sir. Q. And Mother McDonald is not described in either Ex. P-3 or Ex. P-11? A. No, sir. Q. So that it is a necessary conclusion, Doctor, is it not, you did not buy Mother McDonald in that transaction? A. O.K. Q. Isn't that right? A. All right."

Was Anna Chief F one of the mares paid for with the check for $985 and described in Exhibit P-3 or Exhibit P-11 or Exhibit B? She is described in her pedigree papers as a bay mare with star in forehead and left hind ankle white, and foaled September 2, 1931—just fifteen years old in August 1946. As we stated before the only bay mare described in Exhibit P-3 was a two-year-old.

Was Lady Redlight F paid for by the $985 check? Her registry certificate shows her to be a bay mare with a star and both hind ankles white, foaled April 2, 1944. No such animal is described in Exhibit P-3.

Van Buren Queen is described in her certificate as a chestnut mare with short stripe in forehead, and both hind stockings white, and foaled May 16, 1941. There is no mare of her description listed in Exhibit P-3 or Exhibit P-11.

Snell admitted that he could not identify any of the three mares last above described as having been listed in Exhibit P-3. Testifying about the horses listed French said:

"They were not registered mares. Just a load of horses. One little branded mare in the bunch, one little white, four sorrels, one black western mare. There was a two-year-old. He later sold them. He did register them that were eligible for registration; the little Redlight filly and the Pass Key mare."

These last two were apparently No. 5 (Snell's Red Light Lady, bay filly) and No. 9 (Louise Pass Key) on the bill of sale. Snell sold the latter at Kirksville. As we have noted herein, Snell testified that he had no knowledge of where any of the horses were which he bought at that time. Such an admission effectively nullifies his claim that they were among the horses taken on November 14, 1947. He testified that he could never get the registry certificates from French. These men were in a venture together. French had "papers" for each of the seven mares. He and Hartrick together had bred the dams of Van Buren Queen, Anna Chief F and Lady Red Light F. They owned the foals together and raised them. French had registered them and had the certificates before Snell knew him. Snell was not an innocent novice in the blooded horse business. He told the grand jury that the mares were worth $100 each without the pedigree papers, and $250 each with them. A breeder of and dealer in blooded saddle horses would have been as unlikely to buy the mares and pay cash for them without pedigree papers as would an experienced landowner buy a farm without an abstract of title.

But notwithstanding he had claimed to own Van Buren Queen by the $985 purchase he inconsistently claimed her under another title. It appears without dispute that French had placed this mare in the hands of Fred Morton, a saddle horse trainer at Donnellson, who kept and trained her for four or five months. There was some question between them about the price for care and training. The bill was $175 and Morton was about to foreclose his lien, and French had Snell pay Morton what was due. Snell testified: "She was to be sold at sheriff's sale and through French's suggestion I bought her." French testified that Snell wanted to keep her to ride for awhile and he kept her for some time but she became lame from rheumatism, and he sent her back to French, who bred her to his own stallion. He testified that he had reimbursed Snell in full within a week after the latter had paid Morton, to release the lien. This testimony stands undenied.

Snell testified that he could never get but two registry certificates from French. But just prior to the sale on October 28, 1947, in order to have pedigree papers up to date, Snell sent

French to Louisville, Kentucky, with the registry certificates held by each, in order to have the transfers recorded on the issued certificates, and to procure certificates for unregistered, but eligible, horses. Exhibit D-10 is a statement from the association of these registrations and recorded transfers, showing thirteen for French, twelve for Snell and some for Chrissinger and Hartrick. This statement is dated October 23, 1947. It shows seven registrations and three recorded transfers were on Snell's horses listed in the sale bill. Since he disposed of these he no doubt had the pedigree papers to give to the buyers. W. I. Chrissinger went with French on this trip. The statement shows that the transfer on each of the Missouri mares, from Pickens-Burton to French, was approved by the Breeders Association and recorded at this time.

French testified that he and Hartrick each owned a half interest in the seven mares and colt referred to in the indictment.

The State in its printed argument did not place much reliance on Snell's claim that he owned Mother McDonald, Anna Chief F, Van Buren Queen, and Lady Redlight F. And that was true in its oral argument. The trial judge—who the defendant charges took "a most adverse attitude" toward him throughout the trial—was also in doubt as to these four horses. In his ruling on the motion for new trial the trial judge said about these four mares: "I am not so clear about the rest of them, what he might have had. I don't think the evidence is clear on them."

There is also grave doubt under the record concerning Snell's contention as to the three Missouri mares and the colt. Chrissinger told the grand jury that when he refused to advance to French the $600 balance that French owed on the $900 purchase price, "he told me he would get it from Dr. Neil Snell." French did go to Snell, but Snell testified that French did not tell him he had bought the horses for $900 and a $200 commission, or that Chrissinger had advanced $300 of the purchase price. In other words, that although French had invested $200 in cash and had obligated himself for $900 more, and had paid $150 for another mare—a black one—making the total obligation $1050, Snell, nevertheless, testified that French repeatedly im-

portuned him to buy these four mares, one of which Snell testified French said was worth more than the price of the three Ewing mares, for $750—a loss of $300 to French. Such a transaction, to say the least, is out of the ordinary, and not in accord with the usual.

Snell had never seen these mares. He testified that it was his "understanding" that the check for $750 "was for the purchase from Ewing of some mares." Asked if he could describe the mares, he testified:

"One was a bay mare and one was a chestnut mare. No other description of them. I think her registered name was San Nickolena; bay mare. I don't know name of chestnut mare. I don't know the name of third one. Can't describe her. Can't identify her either."

These mares were at the Cartnal farm for almost a year when he testified, yet he apparently had taken no interest in them or their foals and had not even looked at them as an owner would. He evidenced no knowledge of their breeding. He took no bill of sale nor even so meager a memorandum as Exhibit P-3.

French testified that the $750. was to be charged against him in the urine business. Snell admits that he had never made a settlement of this business, but gives as his reason that French had not done his part, and was entitled to nothing.

A number of pertinent queries present themselves. Why, when he had the rather worthless bills of sale executed on October 26, 1947, one of which at that time, according to his testimony, included the four other mares, did he not include the three Missouri mares? Or, if the dates placed on those instruments did not fit, why did he not have a new bill of sale executed·by French for these three mares and their colts? They were more open to an attachment by a creditor of French than those covered by the two bills of sale, all of which were gone and sold but three. These three mares and colts were all at the Cartnal farm, and San Nickolena and her horse colt were listed in the sale bills.

Why, when he had prepared and filed a petition for replevin of a large number of horses which he had previously sold and knew the defendant did not possess, did he not include these

three mares and their colts, if he owned them, especially since they were in fact in the possession of French's codefendants, Hartrick and Chrissinger? He included in his petition the other four mares.

Why did he not say something to French, his associate in business, of his intention to remove the fourteen remaining animals that had been used in the business? And why did he attempt to do this before daylight under such adverse weather and travel conditions? And why, indeed, did he not ask Hartrick who had been caring for all of these horses, to put those belonging to Snell in the corral, or tell him of his plans, instead of having Cartnal attend to these matters?

I. The indictment charged French with stealing the horses of Snell—of feloniously taking these horses. The burden was on the State to establish beyond a reasonable doubt that one or more of these horses belonged to Snell, and second that French took them or had them taken with felonious intent. We will discuss the second proposition first. Proof only of the taking is not sufficient. In the language of law-Latin, the animus furandi must be established by the required proof. This case is not like one where a stranger comes into a community and breaks the lock on a barn door and hurriedly and stealthily takes a horse far away from the community or hides it. Here the defendant, one of the owners of the horses, heard from one who knew and who thought the defendant owned and had some interest in the horses, that Snell planned to haul them out of the country before daylight. The defendant told Hartrick, his co-owner, who was in charge of the horses, to take their horses to some neighboring farm before Snell could take them. Under the circumstances they had to be removed during the night. The defendant told Hartrick that he would see Snell in the morning. Was the conduct of either French or Hartrick the usual and expected conduct of horse thieves? Where did Hartrick take the horses? Just across the road from the Cartnal barn lot to the barn lot of the Fixel farm a distance of 400 yards, where any passer-by might see them. Hartrick then went to his home in Farmington and retired, and the next day about 10 o'clock in the forenoon he went openly to the Fixel farm and took the horses to another farm in the neighborhood owned

22

by Chrissinger who had previously bought saddle horses of the defendant and between whom there was a close acquaintance. There is nothing in the record to fairly or clearly sustain a verdict that either French or Hartrick thought they were stealing any horses. They were trying to protect their property from what they believed was an unwarranted taking. They did what any lawyer might well have advised them to do had he been consulted. Nothing in the conduct of either afterward indicated a guilty conscience.

They had bred and raised three of the mares. A fourth, Mother McDonald, they had bought from Glenn Morris on September 16, 1944. French made a down payment of $150, and Hartrick paid the balance when he went for the mare. Having these mares for some years they naturally believed they owned them. Before French went into the urine business with Snell they had some horse dealings. The Cartnal buildings were not rented until November 1, 1946. It was not until after that date that any of the mares of either were mingled together on that farm. Before that time and on August 14, 1946, French sold the ten mares and two colts to Snell, and took them from his stables and delivered them into the undivided possession of Snell. These four mares were never in the possession of Snell alone, but only as possessed by him and French and Hartrick together in the urine business. There is no evidence that Snell ever made claim to these four mares to French, Hartrick, or to any other person, until, by implication, he asked Cartnal to corral them.

Every witness for the State—Snell, Swailes, Chrissinger, Hartrick—testified that French claimed that he or Hartrick owned each and every one of the eight horses involved in the criminal charge. The State vouched for the worthiness of these men as witnesses. While it was open to the State to show otherwise by other witnesses, it did not do so, and made no attempt to. There was no evidence to the contrary. The State is now bound by the testimony. Neither may it question the credibility of the witnesses. It must stand or fall on the record as made. Cartello v. United States, 8 Cir., Mo., 93 F. 2d 412, 415; Jacobson v. Hahn, 2 Cir., N. Y., 88 F. 2d 433, 435; Wiget v. Becker, 8 Cir., Mo., 84 F. 2d 706, 710, 711; Dravo v. Fabel,

132 U. S. 487, 490, 10 S. Ct. 170, 33 L. Ed. 421; State v. Potter, 195 Iowa 163, 167, 191 N. W. 855; State v. McCormick, 70 R. I. 339, 38 A. 2d 777, 780; Weathered v. State, 128 Tex. Cr. Rep. 263, 81 S. W. 2d 91, 93; Daniel v. State, 60 Tex. Cr. Rep. 515, 132 S. W. 773.

When one accused of larceny openly claims to be the owner of property over an extended period of time, particularly when no one questions his ownership, and there is reasonable basis for his claim, and he publicly possesses it and uses it as owners usually do, such conduct on his part is most convincing evidence that any taking or removal of the property by him was not a stealing or felonious taking thereof. We have studied and analyzed the evidence and the entire record most fully and carefully and we are abidingly convinced that it falls far short of establishing any intent on the part of the defendant to steal or feloniously take, as charged in the indictment, all or any one of the seven mares and the colt on the night of November 14, 1947.

II. On the issue of the ownership of Snell of the mare Mother McDonald, and the three mares which French and Hartrick had bred and raised, it is our firm conclusion and judgment that the State failed to establish that Snell was their owner. The issue should not have been submitted to the jury.

III. With respect to the three Missouri mares and the colt, we are fully convinced that the evidence and the record as a whole fails to establish that Snell was the owner of any of them. The evidence establishes without question that Snell gave French $750 to complete the purchase with Ewing or Pickens-Burton. French claims the money advanced was paid from, or to be charged against, his share of the profits in the urine business, and was the final payment on his purchase of the three mares. French also purchased a black mare, and $150 of the $750 was to pay for it. That animal was apparently kept by French. There is no evidence that Snell ever received it or claimed it. Snell never made any claim to the three mares, unless his filing the information in justice court was such a claim. At the very time he filed the information he verified his petition in replevin, in which he made no claim to these mares or the colt. They are not included in any bill of sale.

24

Certainly the evidence is insufficient to establish any bad faith or wrongful intent of French in claiming these Missouri horses, or that he feloniously took and stole them.

■ IV. It is our conclusion that the verdict of the jury and the judgment entered thereon is against the clear weight of the evidence. This is a criminal action, in which the guilt of the defendant must be established beyond a reasonable doubt. Such a verdict and judgment should be set aside whether it be in a civil or a criminal action. But this court, in numerous decisions, has held that there should be no hesitation in a criminal action in setting aside the judgment on such a verdict. State v. Klein, 218 Iowa 1060, 1064, 256 N. W. 741; State v. Tomlinson, 11 Iowa 401, 403–405; State v. McKenzie, 204 Iowa 833, 834, 216 N. W. 29; State v. Saling, 177 Iowa 552, 555, 556, 159 N. W. 255; State v. Wise, 83 Iowa 596, 599, 50 N. W. 59; State v. Billings, 81 Iowa 99, 114–117, 46 N. W. 862; State v. Reinheimer, 109 Iowa 624, 627, 628, 80 N. W. 669; State v. Johnson, 69 Iowa 623, 624, 29 N. W. 754; State v. Hilton, 22 Iowa 241, 242; State v. Van Gorder, 196 Iowa 782, 793, 195 N. W. 204; State v. Wilson, 234 Iowa 60, 97, 11 N. W. 2d 737.

We have so held even though the verdict is not wholly without support, if it is clearly against the weight of evidence. State v. King, 198 Iowa 325, 334, 335, 197 N. W. 981; State v. Carson, 185 Iowa 568, 570, 571–573, 170 N. W. 781.

In State v. Sullivan, 156 Iowa 603, 606, 607, 137 N. W. 918, 920, speaking through Justice Evans, the court said:

"Giving full credence to the evidence of Scoles (and some of it impresses us as incredible), we think it was clearly insufficient to warrant a conviction of these defendants for the alleged burglary."

If the name "Snell" be substituted for "Scoles," the quotation is most apropos to this case.

Defendant's motion to direct a verdict at the close of all of the evidence should have been sustained and the court erred in not doing so.

V. The court erred in denying defendant's motion for a new trial.

■ VI. After defendant's arrest he was bound over to

the grand jury, apparently without a hearing. He was indicted on December 8, 1947 and arraigned on the same day, at which time Mr. A. L. Heminger, who was present with the defendant, asked that the time for pleading be set for December 12, 1947, for the reason that Mr. Thoma was away. Defendant pleaded not guilty on the day fixed and stated there would be a motion for continuance filed. The court at this time set the trial for December 17, 1947 at ten a.m. Mr. Heminger, being seventy-four years old, crippled and in ill health told defendant that he was unable to and could not assume the burden of the defense. Thoma & Thoma attorneys at Fairfield were contacted and retained December 15, 1947. Motion for Continuance was filed December 16, 1947, supported by affidavits of Roscoe Thoma and Mr. Heminger. The motion was that day denied. On December 17, 1947, a motion to reconsider the Motion for Continuance was denied. Trial was begun December 17, 1947 at 1:45 p.m. The motion and the affidavits set up the inability of the attorneys to properly prepare for the defense on the facts or the law. Such a motion is always addressed to the sound legal discretion of the trial court, and a denial will not be interfered with by this court unless it clearly and affirmatively appears that there was an abuse of discretion and an injustice done to the defendant. In resistance the State urged the inconvenience to the prosecuting witness who was moving to the state of Washington. In passing upon such a motion in a criminal case there should be no balancing of convenience between the prosecuting witness and the defendant's right to a fair trial and the opportunity for a complete defense. The discretion lodged in the judge is a sound legal discretion and his ruling should not be arbitrary or capricious. It is not a personal discretion, but a magisterial one, to be exercised according to the well-established rules of practice and procedure and so guided by law as to effect substantial justice. If it defeats justice then the discretion has been abused. We think justice was defeated in this case, and that it would not have occurred had the able defending lawyers had adequate time to fully investigate the various transactions in Iowa, Missouri and Kentucky, and also to refresh themselves on the applicable law.

The judge in his ruling stated that "it was my opinion at

the time he [defendant] was just stalling to get the matter by that term of court with the idea that the prosecuting witness would not be here when the case came up later, if it came up later."

We find no basis in the record for such an opinion against the defendant or the honorable attorneys who had charge of his defense.

The court erred in refusing to grant the continuance.

The judgment is—Reversed.

All Justices concur.